[Crim. No. 4098. In Bank.—October 6, 1937.]

THE PEOPLE, Respondent, v. JOHN H. BRITE et al.,
Appellants.

Horace F. Frye, Huston, Huston & Huston and J. Everett Barr for Appellants.

U. S. Webb, Attorney-General, and Wilmer W. Morse, Deputy Attorney-General, for Respondent.

SEAWELL, J.—By the indictment found and returned by the grand jury of the county of Siskiyou on November 5, 1936, defendants John H. Brite and Coke Brite, brothers, were jointly accused by said indictment, in three separate counts, with having on August 30, 1936, in said county, murdered three persons, to wit: Martin Lange, Joseph Clark and Fred Seaborn, respectively. Said Martin Lange and Joseph Clark, and each of them, were on said day deputy sheriffs of the county of Siskiyou, and Captain Fred Seaborn was, or had been, connected with the military or naval service of the United States. At the time the last named met his death he was on his vacation, which he annually spent in hunting at the mountain home of Charles C. Baker, situate a short distance from the scene of the three homicides.

By said separate counts it is alleged that at the time of the commission of said homicides by the defendants they were armed with a deadly weapon, to wit, a rifle. It is further alleged therein that each of said defendants, by a judgment

of conviction duly rendered and entered against them, respectively, was on December 22, 1925, in the Superior Court of the State of Arizona, in and for the County of Coconino, sentenced to and did serve a term in the state prison at Florence, state of Arizona.

The location of the place of the homicides is in the northern Siskiyou mountain range, near the source of tributaries of the Klamath River. The facts necessary to an understanding of the case presented require a brief description of the location of the particular place where the defendants were accustomed to and did on the evening of August 29, 1936, park their old model open-top Ford automobile and spread their bed for the night among a cluster of five trees. As a matter of convenience, the general area where the homicides were committed will be designated as ''camp'' or ''the camp''. Said camp was but a few feet from the water's edge of Horse Creek and approximately eight miles from Horse Creek postoffice. The cabin in which the defendants and their parents lived, was situated at the top of a mountain ridge, approximately a mile and one-half from the camp. A mountain trail, steep in stretches and which bore away from the creek, led to the cabin where defendants made their home with their parents. Mr. Charles C. Baker, sole survivor of the furious onslaught waged by defendants, which ended in the death of the two deputies and Captain Seaborn, and who was the principal witness for the prosecution, lived with his wife downstream about a quarter of a mile from said camp. Baker's house was situate near said creek. The home of B. F. Decker, another important witness in the case, was upstream from Baker's residence approximately a quarter of a mile. Robert G. Lanning's house was eighty feet upstream beyond Mr. Decker's. He estimated the distance from his house to the camp to be 110 yards. Both of said houses were on the opposite side of the stream from the camp. The above persons were the only near neighbors living in the sparsely settled section of the locality in which the homicides were committed who testified directly as to matters which may be termed the *res gestae* or as to matters which bore more or less directly upon the question as to whether the defendants were acting within their rights in taking the lives of the persons named in the indictment.

We have read the evidence in the case and we will not attempt to review it in all of its details, as related by the

witnesses, but we shall make reference only to such portions as may be fairly said to support the jury's verdict upon which judgment was pronounced.

Little of the Brite family's background was adduced at the trial other than that the brothers had suffered a prior conviction of a felony, burglary, in the state of Arizona, at which time Coke was twenty years of age, and that they had since resided in the vicinity of the Horse Creek country for a period of more than a year. They gave as their means of livelihood mining and farming in a small way. The only record of trouble had with neighbors by either of the brothers consisted of an encounter which took place between Coke and Charles C. Baker, in the latter's dooryard, approximately two months before the tragic encounter of August 30th. Baker's version of the prior trouble was that Coke came to his home when under the influence of intoxicating liquor, called him a son of a bitch, and cursed and abused him in the presence of his wife. He ordered him from his premises, and, instead of leaving, Coke followed him inside his yard and he then struck him with a club or stick. Whatever may have been the merits of the controversy, the fact remained that Coke harbored a feeling of resentment, if not unsatisfied revenge, against Baker, which was rekindled at the appearance of Baker and Captain Seaborn near the Brite camp at about sunset, while in search of Baker's horse. Unquestionably, each entertained a feeling of hostility for the other. Baker did not know that the Brites were in the vicinity. This incident constituted the first chapter of the gruesome slaying of the two officers and Captain Seaborn.

Mr. Baker testified that about 6 o'clock on the afternoon of August 29, 1936, he and his hunting guest, Captain Seaborn, set out on foot to catch a horse which had strayed from the home premises. In doing so, they took the government trail and walked to a point where a less defined trail led to the creek. This trail took them to the defendants' camp. Captain Seaborn was in the lead and was going to the creek for a drink of water when he noticed a parked car. He called Baker, who seemed to have been some few steps behind, and asked him whose car it was. Baker testified that he answered that it belonged to the Brites. The Brites, on the contrary, testified that Baker said that the automobile belonged to the Brites, "them sons of bitches that live up on the hill". There was a dispute as to whether Baker used the insulting refer-

ence made to the Brites or merely replied to Seaborn's query as he claimed, that the car belonged to the Brites, who lived on the hill. The Brites, who were probably in bed at the instant of approach, both having recognized Baker's voice, arose to their feet. Coke, who admitted that the presence of Baker angered him, yelled to Baker, according to the latter's testimony, and said, "Hey, Baker, what are you sons of bitches doing in our camp?" Seaborn was in the lead, going to the creek for a drink of water, and, according to Baker, both of the Brites rushed upon him, cursing and abusing him. Captain Seaborn, in an effort to avoid threatening personal encounter with them, said: "Boys, I don't know you, and if we have said anything to offend you, I am sorry for it . . . we apologize." They both kept crowding him, striking at him. He was pleading with them to forgive him if he had said anything that had hurt their feelings. He was backing from them in the direction of where Baker had been standing. Baker said he saw them strike him several times. The witness said that one of the Brites, when near the car, threw something at Captain Seaborn which he heard strike the creek bank. This, no doubt, was the quart bottle which had contained wine and which the Brites bought at the Horse Creek store earlier in the day. The bottle was afterward found at the locality in which the described object was thrown. When the Brites were following and fighting with Seaborn, the witness Baker testified that he was backing away, looking for something with which to protect himself and defend Seaborn. The defendants continued to follow Seaborn and Baker and both were retreating in the best order they could to avoid injury. Finally both of the Brites grabbed Seaborn, who was the nearest. Baker said he then went to the assistance of Seaborn and Coke struck him on the jaw and knocked him down. As Coke attempted to come upon him, he kicked him in the stomach and threw him back. In the meantime, Seaborn broke loose from John and grabbed Coke and threw him back from Baker. At this juncture, John struck Baker on the head with a good-sized club, which stunned him. A running fight down the trail for some distance ensued, with Baker and Seaborn retreating in disorderly fashion. Curses and threats to kill which were uttered by the Brites greatly terrified Baker and Seaborn.

Coke Brite told a story different from the one related by Baker. He said he and John had gone to bed and were awakened by some persons talking. The first thing that he heard was someone asking, "Whose car is that?" The other person said, "That is Brite's car." The first voice said, "Who is Brite?". The second voice, which he then recognized as Baker's, said: "That is the sons-of-bitches that live up on the hill." He said he then hollered, "Hey, Baker," and jumped up out of bed. He saw the two men and walked up to Seaborn, whom he did not know, and asked him what he wanted there. John got up about this time. He did not know at the time where the other man was. He heard a noise in the brush and Baker stepped out, carrying a stick in his hand. John jerked it out of his hand after a tussle and struck him on the head with it. When John struck Baker, he (Baker) and Seaborn went down the trail. The Brites then came back to the bed, put on their shoes, and talked about going home, but decided it was too dark and they would wait until daylight. They went back to bed with their shoes on and were next awakened out of their sleep by the hooting of an owl from a nearby tree. John took a .32 automatic pistol from under the head of the bed and shot in the direction of the tree from which the hoots emanated. The ancient solitary bird's reign having been thus molested, it flew from its secret bower and the defendants again fell asleep.

John told substantially the same story related by Coke as to the earlier evening difficulty which preceded the homicides, with the additional statement that he asked Seaborn what he was trying to pull off when he saw him near the camp, to which inquiry he received no reply. In fact, neither Seaborn nor Baker, according to the testimony of the Brites, uttered a single word immediately before or during the above described encounter at the camp. John further supplemented his version of the difficulty with the statement that when Baker was surprised by the appearance of the Brites, he ran back on the trail, went into the brush, and came out with the club which John wrenched from his hands and with which John struck him. Both of the Brites testified that the blow administered to Baker by John was the only blow administered to Baker and that Seaborn was not struck at all. Baker and Seaborn, after they were able to withdraw from the attack of their assailants, made their way to Baker's

house. Baker and Seaborn bore marks of having been roughed. Baker had a knot on his head of considerable size, a small cut on his cheek and his clothing was torn. Seaborn displayed an injured eye, which became entirely closed from bruises which were inflicted by the Brites. The testimony of the Brites to the effect that no blows but one were struck by them and that no words were spoken by Seaborn or Baker was no doubt disbelieved by the jury, as the great preponderance of the evidence and the logic of the situation refute the contentions. The testimony given by Baker as to the several apologies that Seaborn made to the effect that if anything overheard by the Brites had hurt their feelings they offered sincere apologies carries an implication that something was said by Baker which pointedly expressed his dislike and opinion of the Brites. This, however, would not justify an assault upon either.

Baker and Seaborn, upon arriving at Baker's house, decided to have the Brites arrested on a felony charge, and accordingly drove a number of miles in Seaborn's automobile to the home of Charles W. Rainey, Esq., justice of the peace of Oak Bar township. The defendants were thereupon formally charged, by a complaint sworn to by Fred Seaborn and filed against them, with the crime of assault with a deadly weapon, with intent to kill. A warrant of arrest was issued on said complaint or deposition. The warrant did not bear the seal of the court and, because of said omission, defendants claim that the warrant was void. Captain Seaborn and Baker were insistent that the warrant be served during the night. Telephone communication with the sheriff's office at Yreka caused the two deceased deputy sheriffs to be detailed to serve the warrant of arrest. They arrived at the home of Justice of the Peace Rainey at about midnight, at which place Mr. Baker and Captain Seaborn joined them. The warrant of arrest was delivered by Justice of the Peace Rainey to Deputy Sheriff Lange and all proceeded to Mr. Baker's home. From there, after a short stop, they proceeded to the camp on foot. All but Baker were supplied with small flashlights. Captain Seaborn also carried a small Coleman lantern. The camp was reached at approximately 1 o'clock A. M. The officers carried their revolvers in holsters strapped under their arms in the usual fashion. They also wore regulation peace officers' badges. Baker and Seaborn were unarmed. The warrant as above described was in the possession of Martin

Lange, and the directions endorsed thereon were that it might be served at any time during the night. The bed which defendants were in was very near the automobile on one side and not very far from the creek or road on the other. The road generally followed the meanderings of the stream. Again it becomes necessary briefly to refer to the testimony of Baker, the only member of the officers' party who escaped the fusillade of the rapid and deadly firing executed by John, aided and abetted and assisted by Coke, as to what took place at the time the officers and Baker and Seaborn approached the camp. The jury impliedly accepted the testimony of Baker as being substantially an accurate and true statement as to what occurred. If his testimony appears sufficient, together with the other facts and circumstances, to support the verdict, this court would not be warranted in disturbing the judgment on the ground of the insufficiency of the evidence.

Only so much of Mr. Baker's testimony as tends to support the judgment need be stated. It was substantially to the effect that Deputy Sheriff Lange and he walked side by side and Deputy Clark and Captain Seaborn walked side by side behind them as they approached the bed. The moon was shining, but the nearby trees diminished its light. When the party reached the automobile, the forms of the defendants in bed were discernible. Their heads were under the blankets. Flashlights were thrown on the bed, and Deputy Lange said, "Hello, boys, are you asleep?" The defendants began to curse and the witness described the movements of their bodies and arms as those of a person searching or feeling for something concealed under the bed coverings. To use the witness' language, they were "twisting and sliding down in the bed as if hunting for something". Mr. Lange said, "We are officers; you fellows are under arrest" or "Consider yourselves under arrest." One of the men replied that "there was no God damned officers can arrest us". One also said, "The hell you say you are officers; there can't no God damned officers arrest us." They commenced tumbling and sliding down in the bed. The witness illustrated to the jury the movements made by the defendants with their hands and arms. The defendants finally arose to their hands and knees. Both men were cursing. As John began moving toward the foot of the bed, Officer Lange struck him on the head with a "billie". Officer Clark struck

Coke with his billie at the same time and quieted him down. Lange then stepped across the bed and started to put the handcuffs on John, but he moved his hands in such fashion as to balk the attempt. Mr. Lange said to him several times, "Be still; keep quiet. You are under arrest." Coke suddenly rose up, jumped and grabbed the billie, jerked it out of Mr. Lange's hand, and "rode him right on over in front of the car". The trees, automobile and bed were grouped in a small area. The creek bank was very close to the outer side of the bed. Mr. Lange hollered for help. He said, "Take the brute off." Captain Seaborn went to his rescue; Coke was on top of Lange. Seaborn struck him over the head with his flashlight or lantern a couple of blows and then grabbed him and threw him back. Coke then grabbed the 30/30 carbine from under the bed and, turning in the direction of Seaborn, fired. The witness then shouted, "Look out, he has a gun." Just as the gun fired, John grabbed the gun from Coke. The witness then ran from the scene. After the first shot, he heard Mr. Lange holler. Several shots followed the first and he heard Captain Seaborn cry out. As the witness was crossing the creek on a log, he heard Coke say, "Look out, there goes one up the creek. Get that son-of-a-bitch, John, get him." As the witness got to the log, he saw the bark fly from the log, and he jumped into the water and crossed at a different point. Several shots were fired thereafter. In all he estimated the number to be seven or eight. The witness made his way to Mr. Decker's residence and later returned to his home. On returning to his home, he took a zig-zag trail and, to his great consternation, found himself within twenty feet of the Brites. He turned and ran back and, as he did so, Coke said to John, "There is one of them. Get that son-of-a-bitch." The witness ran through the camp ground and observed the bodies of the dead upon the ground, and then made his way to his home.

Coke Brite was the first of the brothers called to the stand in their defense. He testified that they drank some wine and went to bed. John slept next to the car. One of the blankets under which they slept was sewed across the bottom and up one side to the mattress. Directing his testimony to the arrival of the officers, he said that he was awakened by someone throwing himself on top of him and when he started to rise, he was struck across the nose and forehead; he tried

to raise up but was struck three or four times and, when he was knocked down, someone jumped on him and hit him several times on the back of the head, and everything turned black. He thought he passed out. The next thing he knew he found himself standing in the water of the creek. His feet and arms were wet. When he walked out of the creek and got to the rear of the car, John was standing there leaning against the car with the 30/30 rifle in his hand. He testified that no one spoke a word during all the time he was being bludgeoned by the party who jumped on him while in bed, or at any time during the entire combat. When he approached John, he had a conversation with him and John struck at him with the gun. His actions were unusual. He couldn't say whether the stock of the gun was broken off at this time. Mr. Decker, a nearby resident, arrived at the scene of the shooting very soon after it had ceased. Coke remembered that he had heard Decker call his name before entering the camp and he told him to enter. The witness looked around at about the time Decker left and found John sitting on the running board of the car. He picked up John's hat and placed it on his head. He also picked up their .32 automatic pistol, a sack containing a half gallon jug of wine, a piece of bologna and some groceries, and started up the trail for home. John did not act normal. He said several times that they were going the wrong way; he wandered off the trail; he wanted to know what Coke had done to him. John carried the rifle up the hill. Coke said he heard no one calling for help or the firing of guns or any unusual noises at any time, but he did hear Baker's voice at the time he was being beaten by some unidentified person cry out, "Pour it on that son-of-a-bitch. He is the one that hit me." This statement was made after he had repeatedly said that no word was spoken to anyone and it bears the stamp of an afterthought. He said he did not see Baker at any time. Brites' dog was barking angrily and loudly during the tumult of the struggle, which was heard by neighbors a quarter of a mile distant. One witness described the shooting as a "roar of gun fire". The noise and din was so intense that it awakened neighbors out of their sleep. Before leaving for home, he saw several bodies on the ground and heard one of them groaning, but he did not recognize any of them. He heard no one say that the defendants were under arrest, or that the persons attempting to make the

arrest were officers, and he did not recognize any one of the dead as a person whom he had ever seen before.

Upon reaching his parents' home, he made some changes of clothing and, after talking with his parents, he and John decided it was better to go to the mountains. Although Coke neither heard any shots fired nor saw anyone attempting to shoot, he thought that John might have done the shooting. They recalled the mobbing of a man named Johnson for slaying a peace officer of the county some time before and, moved by fears that public feeling might become greatly inflamed against them and that they might be similarly dealt with, if taken into custody, they took to the mountains to escape possibly the wrath of a mob. Eighteen or nineteen days thereafter, through the medium of their parents and the district attorney of Siskiyou County, they surrendered themselves to the law's custody and, as a precautionary measure against violence, they were imprisoned in the state's prison at Represa until afterwards brought to trial.

John Brite testified in substance as Coke testified as to the first encounter. He said the automatic .32 revolver and the 30/30 carbine were fully loaded and were placed at the head of the bed. Other cartridges were on his person. He was awakened by two men beating him with some heavy, hard instrument. He testified at the trial that he heard Baker say, after several blows had been struck, "I'll beat your God damned brains out." He did not know whether his head was under the covers when the beating commenced or not. He usually slept with his head under the covers. The two men were showering blows upon him while he was lying still in bed and he finally called to Coke, "My God, Coke, can't you help me?", but Coke did not reply. He next heard one of the men say, "Grab his arms, I will fix him." He had no memory as to when he arose from the bed. He heard no shots, saw no one use firearms, and had no knowledge as to the happening of anything that resulted in the death of any of said persons at the camp. He was first informed by Coke that three men were dead at the camp when at the corn field near their parents' home. John said he did not recover consciousness until he reached the corn field. He did not know that the stock of the rifle which he was carrying had been broken off during the life and death struggle. Both of the brothers made statements at other hearings which were contradictory in some material respects to their testi-

mony at the trial, but we will not pause to point them out. Their accounts of, or failure to account for, the combat to which they were parties, in any rational or reasonable manner no doubt caused the jury to distrust their testimony absolutely as to having been suddenly and violently assaulted in the manner related by them. Their testimony describing the conflict is from the beginning to the end so improbable and unreasonable, in the circumstances of the situation to which it related, as to be wholly devoid of convincing force or effect. The physical facts as they existed on the ground after the onslaught had ceased effectively refute the claim of want of knowledge on the part of defendants that a mortal combat had taken place, to which they were parties. The ineffable image of the havoc wrought by the defendants could not have been easily blotted from the minds of its chief actors.

The body of Deputy Sheriff Joseph Clark was found crouched forward with the head bent down and the broken stock of the Brite rifle was resting across his back. His coat was thrown up from the back and over his head. A bullet entered his body from the rear, through his shirt and underclothing. His coat, by reason of being pulled up over his head, showed no bullet puncture. In its course, the bullet severed the spinal column, shattered several vertebrae, and came out at the armpit, making a wound which admitted the hand of the autopsy physician from exit to entry. A copper jacket was found by the embalmer in his stomach. Another copper jacket was found in his right arm near the elbow. The physician was of the opinion that death ensued instantaneously. The body showed bruises or contusions at the base of the nose, chin and hands.

Deputy Martin Lange's body showed two bullet wounds between the eyes; a wound below the right eye; a split in the lip and the ear; an abrasion at the upper point of the nose; upper jaw broken; and the entire frontal structure of the face crushed inward. The right ear was half severed from the head and a deep penetrating puncture wound, made no doubt by the hammer of the rifle used as a bludgeon, entered the skull. There was also a large wound on the back of the head and the left eye was protruding from its socket. The left leg near the hip was badly shattered by the entry of a bullet. The bony structure of the head was so badly shattered by gunshots and from the use of a heavy instrument as

to make it impossible to follow the original bone structure. The facial mutilation was so extensive as to make identification impossible.

Captain Seaborn's body showed a deep penetrating wound above the right eye. It was not made by a bullet. The hammer of the gun, used as a club, would make such a wound. The bone was depressed into the skull. There were two penetrating wounds in the right axilla (armpit). The upper one easily admitted the index finger into the lung and the lower one appeared to be a tear into the flesh which extended downward to the rib. The wound on the forehead caused a compound fracture of the skull. The bullet which entered under the arm separated from the copper jacket and both were embedded in tissue on opposite sides of the spinal cord. There was also a fracture of the upper part of the head.

We have set forth the methods of killing, both by shooting and by the bludgeoning of two of the victims in a most shocking manner, as indicative of the demoniacal fury with which the killing was executed.

Murder is defined by the statutes of this state as the unlawful killing of a human being with malice aforethought. (Sec. 187, Pen. Code.) It is implied when no considerable provocation appears, *or* when the *circumstances* attending the killing show an *abandoned and malignant* heart. (Sec. 188, Pen. Code.) All murder perpetrated by any kind of wilful, deliberate and premeditated killing is murder of the first degree. (Sec. 189, Pen. Code.) Uncontrovertibly the circumstances attending the killing showed an abandoned and malignant heart. The shooting of Officer Lange twice between the eyes, either of said shots being deadly, and a third shot through the thigh, and the added infliction of the deadly blows upon his head and face, as described by the evidence, is conclusive proof as to the deliberate, predetermined and premeditated intention on the part of the defendants to kill. The same is true as to the killing of Seaborn and Officer Clark in perhaps a less merciless degree. The attempt to kill the fleeing Baker gives further support to the implied finding of the jury that the killing was done with a preconceived intent to kill, and with an abandoned and malignant heart. There was no room for justification of the extreme degree of cruelty which the defendants employed, on the grounds of self-defense. That the intention to kill and the act of killing may be as instantaneous as successive thoughts of the

mind is an axiom of our criminal law. The law making available the right to kill in self-defense is too well understood to require restatement.

We have carefully read the evidence and are of the view that neither Captain Seaborn nor Baker was armed. Mr. Decker and Mr. Lanning, the first to arrive at the scene of the killing, were of the opinion that they saw the butt end of a pistol on Seaborn's person. Mr. Lanning was not so positive in the matter as was Mr. Decker. The only light used by them at the scene was a searchlight and they made no close inspection of the bodies. Seaborn had with him both a flashlight and a lantern and without doubt what Mr. Decker and Mr. Lanning saw was one of the flashlights that were used by the deputies or by the persons accompanying them. Clark's pistol was in his holster on his person. Lange's pistol had been removed from its holster and was found near the body of Seaborn, partially trampled into the soft earth. Baker was unarmed. Every pistol found at the scene was positively accounted for and none was traceable to Seaborn. Both Baker and Seaborn's son gave testimony which made it clear that Seaborn could not have been armed. An examination of the weapons found at the scene showed that none had been discharged. Two empty cartridge shells and two loaded ones were picked up on the grounds, which fitted the Brite rifle.

Mr. Decker testified that John did not seem to fully recognize him immediately after the shooting and asked him when he approached what he was doing in his camp. He thought he did not act in a normal manner and that his mind was not clear. He acted irrationally. He noticed blood on his face. The evidence did not convince the jury that either John or Coke received other than minor injuries. John testified to the effect that he was unable to wear a hat, that his head was sore for several days after the shooting from blows he had received, and that he had a cut about an inch long over one eye. The testimony was given such consideration as the jury deemed it merited. No major or serious injuries of any kind were inflicted upon either. Coke complained of an injured arm and head injuries. The claim that both were rendered oblivious to all that happened by reason of the beating they received at the hands of the officers is weakened by their asserted recollection of hearing prejudicial statements uttered by Baker during their periods

of unconsciousness. These statements, made by Baker, they said, were the only words they heard spoken during the fatal encounter.

Naturally the defense made a vigorous effort to break down the testimony of Baker. To this end the defense called three citizens living in the vicinity who testified that Baker's reputation for truth, honesty and integrity in the community in which he lived was not good. The prosecution called a much larger number who testified that it was good. His testimony stood the test of reason. The jury believed him and we see no substantial reason to discredit his testimony.

 The defense makes the point that, according to Baker, the officers were the first to use a weapon, to wit, billie. This is true, but the billies were used after all reasonable means had failed to induce the defendants to submit to peaceable arrest. The defendants manifested a belligerent attitude by the use of violent language, and by their menacing the suspicious movements under cover of the bed clothing gave reason for the officers to fear that they were preparing to do that which they finally succeeded in accomplishing. As reasonable men, in the circumstances of the situation, the officers were justified in using as much force as appeared reasonably necessary to enable them in safety to themselves to compel submission to the law's processes. Baker's testimony does not justify the conclusion that the force used by the officers was excessive. The subsequent developments sustain his statement. The billies of the officers, one of which was pulled in two during the struggle and found on the ground, were flexible and made of soft leathern material. One end was bulb shaped and contained shot loosely placed in the bulb. The cavity of the bulb was not entirely filled with shot, but only to such an extent as to give it sufficient weight to serve its purpose. The flexibility of the bulb is designed to prevent it from cutting or lacerating the flesh. Its length was about fourteen inches. A leathern wrist band was attached to one end of the billie. The billie used by Lange was pulled in two by Coke grabbing and holding to it, and Officer Clark's billie was found on the ground. Evidently neither was used longer than a few seconds.

Measured by the doctrine of appearances, the officers were entirely justified in resorting to the use of the billies, if the situation was as described by Baker. As the matter turned

out, it is patent that they were not sufficiently vigilant for the protection of their lives, and they resorted to such means only as in their judgment appeared necessary to execute the law's command.

It is true that Baker testified that the officers used their billies several times on the defendants. He also testified that the blows were lightly administered at intervals in an attempt to compel submission to arrest, while defendants plainly showed, by their movements under cover, the purpose and plan of maneuvering themselves under cover into a position where they could reach their weapons and resist arrest with armed force. The jury no doubt impliedly found that the officers were fully justified, knowing what they knew and seeing what they saw, in using the means which they adopted, and that no unnecessary or excessive force was used by them. It is also true that Mr. Decker testified that he took hold of John very soon after the shooting for fear that he might shoot him and that he thought his conduct not rational. John had been through a terrible ordeal and it would be strange if the vehemence of the struggle had not left him in a somewhat confused mental state. He did admit to Decker, however, that he had killed all the men he saw lying on the ground.

It is claimed by Coke that he did not recover consciousness until he found himself standing in the water of the creek after the shooting had occurred. The creek was near the edge of the bed and close to the scene of the struggle. It was his claim that he was struck and knocked into the creek.

█ Appellants objected to and assign as prejudicial error the admission in evidence of the warrant of arrest, on the ground that it was void for the reason that it did not bear the seal of the magistrate who issued it. The objection is based on the amendments of 1933 of sections 147 and 153 of the Code of Civil Procedure. The amended sections are listed in the code under part 1, title 1, chapter 7, article 6, Code of Civil Procedure, which provides for the "organization and jurisdiction of courts of justice in general". Article 6 of said chapter 7 provides for seals of courts. Section 147, as it stood prior to the 1933 amendment, provided that the following courts shall have seals: 1. The Supreme Court; 2. The superior courts; 3. The police court of every city and county. Municipal courts were added in 1925. The documents to which seals need be affixed, prior to the amendment,

were: A writ; the certificate of probate of a will or of the appointment of an executor, etc.; and the authentication of a copy of a record or other proceeding of a court, or of an officer thereof, etc.

By said amendment of 1933, the legislature added to the list of courts required to have a seal, "The Justices' Courts." It also amended section 153 to conform with section 147 by providing that "Except as otherwise expressly provided by law, the seal of a court need not be affixed to any proceeding therein, or to any document except" the proceedings or documents designated and set forth in the 1933 statutes, to which were added "a summons" and "a warrant of arrest". The addition of "a warrant of arrest" furnishes the basis of appellants' contention that the warrant of arrest was and is void for the reason that it did not bear the impress of the seal of the court. It will be noted that the Code of Civil Procedure, in providing for the use of seals, uses the word "courts" and in no instance do the Code of Civil Procedure sections refer to or mention a committing magistrate as an officer who shall have a seal. Then the Penal Code, throughout its numerous sections, *ex industria* prescribes the procedure which a magistrate must follow in cases "where an information is laid before a magistrate charging the commission of a public offense". He must examine on oath the complainant and any witnesses he may produce and take their depositions and cause them to be subscribed by the parties taking them. (Sec. 811, Pen. Code et seq.) Section 806 of the Penal Code, provides: "The complaint is the allegation in writing made to a *court* or *magistrate* that a person has been guilty of some designated offense." A complaint issues in a justice's court where the offense charged is a misdemeanor committed within the jurisdiction of a justice's court, and has no relevancy *to a deposition* laid before a magistrate charging the commission of a felony. Section 1426 of the Penal Code, provides that "all proceedings and actions before a *justice's* or police *court,* for a public offense of which such courts have jurisdiction, must be commenced by *complaint* under oath", and "if the justice of the peace is satisfied therefrom that the offense complained of has been committed, he must issue a warrant of arrest substantially" as prescribed by section 1427 of the Penal Code, the section from which the above quotation is taken.

A justice of the peace, when acting as a court, is given

the power of trying causes and rendering judgments of imprisonment upon conviction, but, when acting as a magistrate in the preliminary examination of a person accused by deposition of a public offense, he has no such power. The full limit of his power is, after examination, to hold the accused to answer *at trial,* unless from the examination it appears that no offense has been committed or there is not sufficient cause to believe the defendant guilty of a public offense, in which event the magistrate must order the accused discharged. (Secs. 871, 872, Pen. Code.)

Section 807 of the Penal Code, defines a magistrate as "an *officer* having power to issue a warrant for the arrest of a person charged with a public offense". The following section, 808, declares the following persons are magistrates: "The Justices of the Supreme Court; the judges of the Superior Court; the judges of the municipal court; justices of the peace; police magistrates in towns or cities." Section 814 of the Penal Code, prescribes the form of a warrant of arrest which the magistrate must issue and sign as *magistrate,* if he has "reasonable ground to believe" that the defendant has committed the offense complained of. The sections of the Code of Civil Procedure upon which appellants rely make no specific reference to the sections of the Penal Code which have existed as the fundamental law of the state with respect to the functions of a magistrate since the adoption of the codes.

This court, in *People* v. *Cohen,* 118 Cal. 74 [50 Pac. 20], had occasion to distinguish the powers of a magistrate from those of a court. Cohen was convicted of perjury alleged to have been committed in testifying falsely on the preliminary examination of one Sternberg on a charge of false registration and appealed from an order denying him a new trial. The reversal was placed on the ground that the demurrer to the indictment should have been sustained, as it did not appear from the indictment that the officer by whom the alleged false oath was administered had authority to administer the same. The allegation was that the defendant appeared as a witness before the Honorable William T. Wallace, Judge of the Superior Court of the City and County of San Francisco, sitting as a magistrate in the examination of a felony charge then pending against said Sternberg. It was alleged that a duly appointed, qualified and acting deputy county clerk of said city and county, and an officer authorized by law to ad-

minister oaths, and to administer an oath to the defendant Cohen, did administer to the said Cohen an oath in due form of law. It is probable that said deputy clerk was the deputy regularly assigned to the department of the superior court over which Judge Wallace presided. This court held that a judge of the superior court sitting as a magistrate was a creature of the statute and, as such, he does not retain and possess all the powers and attributes possessed by him as a judge of the superior court, with the same general right to have the attendance and services of the county clerk as when holding a session of the superior court or transacting judicial business at chambers; that it was not competent for the clerk to swear the defendant as though the proceeding had been one before the superior court. The office, it was said, ''is purely a statutory one, and the powers and duties of the functionary are solely those given by statute; and those powers are precisely the same whether exercised by virtue of one office, or that of another''. In short, it was held that when a judge of the superior court is exercising the functions of a magistrate he is not clothed with the powers the law confers upon him when sitting as a judge of a superior court. He is not designated by statute as judge or justice of a court and is not included as such within the list of those who shall place a seal to a warrant of arrest and there is no amendment of any of the sections of the Penal Code changing the long-established custom and practice by which persons against whom an information is laid before a magistrate shall be brought before him for examination. The arresting officer is not compelled to show the warrant to the person arrested, unless required to do so. (Sec. 842, Pen. Code.) In certain cases an arrest may be made without a warrant. By reason of the long-adopted system, as outlined by the penal laws of the state, and a failure to indicate a direct or positive intention on the part of the legislature to revise by amendment the criminal code, we are of the opinion that the amendments to sections 147 and 153 of the Code of Civil Procedure, do not and were not intended to require a magistrate of a rural judicial township of the state to place a seal on warrants of arrest issued by him. There would be no reason in requiring magistrates to affix a seal and to exempt coroners, if the intention were to guard against the issuance of fictitious warrants or false impersonations. If such were the purpose, the statute should also have included ''coroners''. Sections

1517 and 1519 of the Penal Code, provide that if the jury finds that the person was killed by another under circumstances not excusable or justifiable by law, or that death was occasioned by criminal means, and the person responsible therefor is not in custody, "The coroner *must* issue a warrant, signed by him, with his name of office, . . . for the arrest of the person charged". Yet the coroner is not named in said section (153, Code Civ. Proc.) as an officer whose warrant of arrest must bear the seal of his office. Neither is a magistrate. All of which gives persuasive force to the contention that said section was not intended to apply to the general scheme of criminal procedure adopted by the criminal code and which remains unchanged. Certainly it is not likely that the legislature would have overlooked so extensive and important a branch of substantive law.

▮ Respondent argues with much strength that, since the legislature did not see fit to amend section 814 of the Penal Code, at the time it amended sections 147 and 153 of the Code of Civil Procedure, it was the intention of the legislature that said amendments should apply only to such warrants of arrest as are authorized by sections 1216 and 1993 of the Code of Civil Procedure, and which have their origin in civil proceedings or *quasi*-criminal matters. The argument that they were not intended to apply to a case in which the warrant is to be served in the county in which it was issued is given support by the note to section 147 of the Code of Civil Procedure. It is there stated that the purpose of providing seals for justices' courts was to make the "process of the justices' courts extend throughout the State, eliminating the requirement of a certificate from the county clerk on summons, writs of attachment, etc., when served outside the county. The seal of the court should be sufficient identification."

The above note seems to offer a very convincing explanation of the purpose of said amendments. The warrant in the instant case was not served without the county in which it was issued.

▮ We are of the view that the provisions of section 836 of the Penal Code, gave the officers who attempted to make the arrest authority to do so without a warrant of arrest. Subdivision 3 of section 836 of the Penal Code, provides that a peace officer may without a warrant arrest a person: " . . . 3. When a felony has been in fact committed and he has reasonable cause for believing the person arrested to have

committed it; 4. On a charge made, upon a reasonable cause, of the commission of a felony by the party arrested.''

The evidence, as already detailed, amply supports the claim that there was reasonable cause to believe that the defendants had committed a felony. Seaborn had been violently assaulted and Baker had been knocked down and struck upon the head with a large club and pursued in the night some distance down a mountain trail by the defendants uttering threats to kill. Furthermore, the officers had talked with Baker and Seaborn as to the nature and violence of the attack and threats made by appellants and believed that they were dangerous men. They had also talked with the justice of the peace who delivered to them a warrant of arrest charging appellants with an assault with a deadly weapon with intent to kill. Under the circumstances of the case, we are of the opinion that the officers could have made a lawful arrest without a warrant. The court instructed the jury that if they found as a fact that Martin Lange and Joseph Clark were peace officers of said county, then, as a matter of law, the evidence shows that they had reasonable cause to believe that the defendants had committed a felony. There was no conflict in the evidence as to the grounds upon which the officers' belief was founded. ▪▪▪ ''Probable cause is a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.'' (*Davis* v. *Pacific Tel. etc. Co.*, 127 Cal. 312, 319 [57 Pac. 764, 59 Pac. 698]; *Murphy* v. *Murray*, 74 Cal. App. 726 [241 Pac. 938]; *Johnson* v. *Southern Pac. Co.*, 157 Cal. 333 [107 Pac. 611].) Reasonable or probable cause is a question of law, where there is no conflict to be decided by the court. (*Collyer* v. *S. H. Kress & Co.*, 5 Cal. (2d) 175 [54 Pac. (2d) 20]; *Davis* v. *Pacific Tel. Co.*, *supra*.)

Our conclusion is that the officers were attempting to make a lawful arrest at the time the homicides were committed by authority of a warrant regular in form and substance, and, further, that without said warrant there existed reasonable cause to believe a felony had been committed by appellants.

Appellants rely upon the rule announced in Wharton's Criminal Law, twelfth edition, volume 1, page 785, stated as follows: ''At common law if a warrant commanding the arrest of an individual in the name of the State have no seal, it is void. If an officer attempts to arrest the party named upon such authority, he proceeds at his peril, and is a wrong-

doer; and if he be killed in the attempt by the party, the slayer is guilty of manslaughter, and not murder.'' It is upon the authority of the foregoing statement, supported by some jurisdictions, that appellants insist in the instant case that the warrant was void, and appellants could not have been convicted of a higher degree of homicide than manslaughter. There is a conflict of authority as to whether the omission of a seal when required by law to be affixed renders the warrant void or voidable, or amendable. The trend of modern authority seems to favor the proposition that such omission does not render void a warrant of arrest. In view of our holding that the warrant was valid, it becomes unnecessary to consider the proposition further.

 We have considered the instructions and find no reversible error either in refusing to give requested instructions or the giving of erroneous instructions. The charge to the jury covered every essential principle of law necessary for the jury's instruction. Appellants complain of the court's refusal to give instruction number seven in particular. We think appellants did not suffer prejudicial error because of such refusal. It dealt with the proposition that ''neither insulting language nor an unsuccessful attempt by one under arrest to assault the officer justifies an assault upon him by an officer, if no reasonably prudent man could conclude that the attempted assault could have been successful''. The language of the instruction is somewhat involved and in the face of several well-worded, comprehensive instructions, defining the appellants' rights in the circumstances of the assault, no prejudice was suffered. Instruction XXXIII, which is but one of several given at the behest of appellants, reads:

''The Court instructs the jury that even though the defendants, at the time and place here in question, were subject to arrest by the officers and those acting in concert with them, the defendants nevertheless had a right to protect themselves from any unwarranted attack, if any, made upon them by the officers. The law is that every person has a right to resist an unlawful attack upon his person, whether that attack is made by a private citizen or an officer of the law, and the degree of force one may use in resisting such an attack, whether by private citizen or by a police officer, is governed by the force and danger of the attack. One unlawfully attacked .in such manner as to reasonably appear to endanger

his life or limb may resist even to the extent of taking the life of his assailant if that to him appears reasonably necessary. Accordingly, if you find and believe from the evidence in this case that the officers and those acting in concert with them did make an unlawful attack upon the defendants and that the attack was such as to make it appear to a reasonable person placed in the position of the defendants, that they were in immediate and imminent danger of losing their lives or receiving great bodily harm, or, if you have a reasonable doubt whether or not such a condition then confronted the defendants, you should give the defendants the benefit of the doubt and return a verdict of not guilty.''

. Appellants earnestly insist that the court committed reversible error in denying their motion for a change of the place of trial to another county than Siskiyou, in which the homicides were committed. In support of said motion defendants filed affidavits supported by the affidavits of their attorney, Horace F. Frye, Esq. It was averred in said affidavits that a fair and impartial trial could not be had in said county of Siskiyou for the reason that said officers who were killed were well-known officials and were universally held in high esteem and respect by the inhabitants of said county; that both the local and metropolitan newspapers had repeatedly printed in large type upon the first pages of their publications, which were circulated and read by the residents of said county, articles bitterly denunciatory of the defendants and written in a fashion which had a tendency to prejudice the defendants in the minds of the residents of said county and to incite the citizens of the county in which said homicides were committed to a high state of feeling and expressions of open hostility against defendants; that defendants were branded as cold-blooded murderers and it was openly stated by citizens of said county that defendants should be lynched when apprehended; that one newspaper printed an article in which it favored offering a reward for the apprehension of said defendants ''dead or alive, but preferably dead''. There can be no doubt that the homicides caused, as they usually do in such cases, a strong feeling of indignation against the defendants. Public feeling, inflamed by the press accounts of the killing, extended into other parts of the state far removed from the local county. The respondents filed fifteen counteraffidavits to those filed by appellants in which the affiants averred that the defendants could have

a fair and impartial trial, free from bias and prejudice, in the county of Siskiyou. Citizens of various callings and residents of various sections of the county, admitting in most cases that public feeling ran high for a short time after the killing, averred that it finally subsided and reached its normal level before the trial, which was some three months after the homicides had been committed, and that the defendants could have a fair and impartial trial; that the public feeling had entirely subsided.

We have examined the affidavits and cannot say, as a matter of law, that the trial court committed error by denying the motion for a change of the place of trial. The granting or refusing of a motion for a change of place of trial is essentially a matter which rests in the sound discretion of the trial court, who ordinarily is a resident of the county in which the venue lies and better able to pass understandingly on the motion than an appellate court would be. In *People v. Hall,* 220 Cal. 166 [30 Pac. (2d) 23, 25, 996], this court said:

"Under the circumstances and because of its proximity to and familiarity with conditions prevailing in the county, we are not prepared to say that the trial court abused the discretion vested in it when it denied the motion for change of venue."

A score of cases might be cited in which this court has repeated the rule that the denial of a motion for a change of place of trial will not be reversed unless it clearly appears to this court that such discretion has been abused. No such showing has been made.

The trial was conducted with commendable fairness, both in rulings on the admission of evidence and in giving instructions. We are not aware of any errors of law which would justify our interference with the judgments.

The judgments and orders as to each appellant are affirmed.

Shenk, J., Curtis, J., Waste, C. J., Edmonds, J., and Nourse, J., *pro tem.,* concurred.

Rehearing denied.