[Crim. No. 5728.   Second Dist., Div. One.   Jan. 16, 1957.]

THE PEOPLE, Respondent, v. RUSHTON PAUL,
Appellant.

Gerald J. Levie and S. V. O. Prichard for Appellant.

Edmund G. Brown, Attorney General, and Bonnie Lee Hansen, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendant was accused of escaping from the lawful custody of a deputy sheriff of Los Angeles County while in custody under a felony charge, to wit, robbery (Pen. Code, § 4532, subd. (b)).

Following entry of a plea of not guilty the cause proceeded to trial before a jury resulting in a verdict finding the accused guilty as charged. His motion for a new trial was denied and he was granted conditional probation.

From the judgment of conviction and from the order denying his motion for a new trial, defendant prosecutes this appeal.

With regard to the factual background surrounding this prosecution the record reflects that on the morning of January 3, 1956, between 1 and 1:30 o'clock, Mrs. Betty Lame was working alone as night clerk at a liquor store in Los Angeles County, when defendant entered the store. He had his right hand in his pocket when he entered the door. As he walked in, Mrs. Lame greeted him, but there was no answer; he merely "gave her an angry look." The defendant walked to where the refrigerator delicatessen case begins. Mrs. Lame spoke again, and the defendant just continued walking up the customer's part of the store in an easterly direction toward the beer case. Mrs. Lame then asked if she could help him. Less than one minute elapsed before he reached the easterly end of the refrigerator case. The defendant turned into the aisleway between the delicatessen case and the beer case. As he walked out of Mrs. Lame's line of vision, where she was stationed behind the counter, she continued to observe him in the mirror.

When defendant turned into the aisle leading to the private part of the store (the owner's living quarters), Mrs. Lame said, "You can't go back there; that isn't customer area." Defendant made a partial turn and looked at her as though, according to her testimony, to say, "Oh, I can't?" He then continued to walk to the back of the store.

Mrs. Lame became frightened because ". . . his expression and his actions were not that of a customer . . . He had not offered to buy anything, and he was going some place where

he was told not to go.'' She jumped over the counter, and went out the door.

Then she looked through the window of the store, but did not see the defendant. She then stopped two boys in an automobile and asked them to call the police. Mr. Fowler, the driver of a second car, was also stopped. Mrs. Lame asked him to call the police, and told him a man had entered the store, gone back to the living quarters, and was going to hold the place up.

Mr. Fowler called the police from a filling station. Deputies Vaughan and Swenson, who were on patrol, drove to the station where Mr. Fowler told them that there was a man holding up a woman at 6912 South Central, in the liquor store, or words to that effect. Mr. Fowler and the police drove to the store.

The two boys in the first car returned about three to five minutes after Mrs. Lame had talked with Mr. Fowler. They remained with Mrs. Lame until the police arrived.

During the 15-minute interval between the time she vaulted the counter 'and the police arrived, she had looked in the window several times, but did not see the defendant. About three to five minutes before the police arrived, while she was standing in front of the store with the two boys, she saw the defendant in back of the beer case, and facing toward the aisle leading to the living area, where the owner frequently kept large sums of money. The defendant turned, saw Mrs. Lame outside, and then came out of the store. He told Mrs. Lame and the two boys, that he was looking for a preacher.

When the police arrived, Deputy Sheriff Swenson covered the defendant and the two boys, who were in front of the store, with a shotgun, and told them to put their hands up. He then ''shook them down.'' The defendant was carrying no weapons.

Mrs. Lame told the police, immediately on arrival, that the defendant had come in the store, wouldn't speak, and went back into the living area where he was not supposed to go, after he had been told it was not customer area, and that he remained there approximately 15 minutes. She also told them she thought he was going to hold up the store; and that valuables were kept in the living area in back of the store.

Mr. Fowler testified that when the defendant was told to put his hands up, he was informed that he was under arrest. The officers testified, however, that there was no arrest made at that time.

While the defendant was kept under surveillance outside the store, Deputy Swensen and Mrs. Lame went inside. There, Mrs. Lame told him that the defendant had come into the store, did not answer when she spoke to him, went into the back after she told him not to, and stayed in the store approximately 15 minutes. Mrs. Lame went behind the counter, demonstrated her position, and showed Deputy Swenson how the defendant acted. She told him that when the defendant walked in the front door he had a "fierce" look on his face; that she had spoken to him and he had said nothing, but continued in a deliberate manner toward the rear of the store, and as he started behind the counter, she told him it was not the place for customers. Mrs. Lame also told Deputy Swenson that defendant had been in the store quite a long time and that she thought his purpose in going behind the counter was to determine if anyone else was in the store. Mrs. Lame was not sure whether anything was disturbed or missing, because the defendant had been out of her sight.

Deputy Swenson then came out of the store and told Deputy Vaughn what Mrs. Lame had said, and that the defendant "looked like a fairly good robbery suspect." Deputy Swenson asked the defendant a number of routine questions in straight English, but the answers were incoherent. So he used slang, and said to the defendant, "There is no use shucking and jiving. We know what has been happening around here. Let's see what's shaking," and other similar statements. The defendant placed his hands down, looked through the "close of his eyelids," rolled his head back and said, "Let's dance." Deputy Swenson formed the opinion that defendant was under the influence of narcotics.

Deputy Swenson and Mrs. Lame went back inside the store, after which Deputy Vaughn questioned the defendant and also formed the opinion that the latter was under the influence of narcotics. Deputy Vaughn asked the defendant his name, and where he lived, but received no answer. When the defendant was asked what he was doing there, he replied, "I was looking for a preacher in a C-47 Cadillac." Deputy Vaughn requested the defendant to remove everything from his pockets, and found a Los Angeles County jail property envelope stamped with an "N," which is the type given to narcotics suspects at the jail. The defendant stated that he had been arrested approximately one month prior for narcotics, and was a "poor sick hyp." He said that he had taken a "shot" that afternoon, and that he was using "that real

good brown stuff.'' The defendant also said that he had entered the store ''to do some harm.''

After defendant had made these statements, he was informed that he was under arrest for suspicion of robbery and narcotics.

After defendant was informed that he was under arrest, Deputy Tittle attempted to handcuff him. The defendant grabbed the deputy's wrist, and there was a scuffle during which the former and Deputy Tittle proceeded in a northerly direction around the corner from the store to a parking lot. The defendant broke loose and ran between two rows of parked cars. Deputies Vaughn and Tittle ran after him yelling for him to halt, or they would shoot. Shots were fired by both deputies and the defendant was found wounded under a parked automobile.

On the third or fourth day of January, Sergeant Aure talked to the defendant in the hospital, and asked him, ''What were you doing in back of the liquor store?'' to which he replied that ''he was looking at the parrot.''

Sworn as a witness in his own behalf, defendant testified that on the occasion in question he entered the liquor store to make a purchase. That as he walked in, he observed the clerk who was sitting behind the counter. He wandered around the store to decide what to buy, but did not at any time walk to the west side of the beer refrigerator. That while he was in the store he looked through the glass refrigerator and saw a parrot.

During the time he was in the store, nothing was said to him.

That after he had been inside the store about two minutes, he turned around to ask the clerk about the cost of a couple of items, and found that he was alone. He noticed that the clerk and two men were standing outside the store looking in at him through the window. He immediately went outside to get a few answers as to the price of certain items. When he went outside, he did not speak to the three people outside, nor did anyone speak to him.

That there were a couple of police patrol cars present, and an officer ordered him to back up against the glass wall and put his hands over his head. One officer asked him his name.

That he took everything out of his pockets, and one of the officers looked over the items. The envelope found in his pocket was issued to him while he was in jail for a traffic violation. The defendant further testified that he had never

been arrested for suspicion of violation of the narcotics laws. He denied telling anyone that he had been arrested a month before for narcotics; that he was a "hyp"; or that he was using that "brown stuff," and had had a "shot" that afternoon. He denied telling anyone he was looking for a preacher in a C-47 Cadillac and said that he did not tell anyone that he had entered the store to do the lady harm.

The defendant further testified that he overheard Officer Vaughn say to his partner, "We may as well shoot this one." He asked one of the deputies what was going on, but there was no response. He said that he was never told by anyone that he was under arrest.

That Officer Vaughn pushed him and forced him to the parking lot with a shotgun. He did not offer any resistance to being pushed, other than to shrug his shoulders and say, "Well, where are you taking me?" That after he and the two officers reached the parking lot, he was shoved against an automobile. That Officer Vaughn slapped him in the stomach and on the face, and he was kicked in the lower part of the body by one of the officers. He fell down, and Officer Vaughn told him to start running. That he ran because he was afraid.

The defendant further testified that he ran north for about 25 to 30 yards, and was then shot. He continued to run after being shot, and got under a parked car. That while he was running, he did not hear either of the officers tell him to stop or halt.

In rebuttal, Officer Vaughn testified that at no time did he state to his partner, or anyone else, "We might as well shoot this one," nor did he kick, punch, slap, or strike the defendant.

Officer Tittle testified that no blows were struck while he was scuffling with the defendant, nor did he kick the latter in the groin.

The owner of the store, Mrs. Leightner, testified that it was impossible to see into the back of the store through the beer case, because the refrigerator had a steel back. That the parrot was always kept covered at night, and made no noise unless a stranger came into the back of the store. She did not know personally, whether the parrot was covered on the night in question.

Mrs. Leightner also testified that all items in the customer's part of the store are kept marked.

A fingerprint expert, Mr. Clark, identified the fingerprints of the defendant as identical with those appearing on a booking slip which indicated that there was a narcotic charge filed on December 14, 1955, against one Rushton Paul, or Paul Rushton.

As his first ground of appeal it is urged by appellant that the verdict rendered is contrary to the law and the evidence. In support of this contention appellant first contends that his arrest was unlawful and that he was entitled to use such force as was necessary to prevent the arrest, or to effect his escape after arrest (*People* v. *Perry,* 79 Cal.App.2d Supp. 906, 915, 916 [180 P.2d 465] and cases therein cited). ▮ It must be conceded that if the arrest was unlawful, the reason which makes flight from the custody of an officer a crime does not exist because section 4532, subdivision (b), of the Penal Code, under which appellant was accused, specifically provides that the person restrained must be in the *lawful* custody of the officer. This brings us to a discussion of the vital question of whether the arrest of appellant was lawful. ▮ Since the arrest took place at 1:30 a. m., the court may take judicial notice that it was at night (*People* v. *Lewis,* 136 Cal.App. 405, 410 [29 P.2d 305]; *People* v. *Chee Kee,* 61 Cal. 404). ▮ Under Penal Code, section 836, subdivision 5, a peace officer may, without a warrant, arrest a person at night when there is reasonable cause to believe that he has committed a felony. In *People* v. *King,* 140 Cal.App.2d 1, 6 [294 P.2d 972] it was said:

" 'The term, reasonable or probable cause, has been defined: "By 'reasonable or probable cause' is meant such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion, that the person accused is guilty." (*In re McCarty,* 140 Cal.App. 473, 474 [35 P.2d 568].)' "

" 'The term, probable, has been defined as meaning "having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt." (*Ex parte Heacock,* 8 Cal.App. 420, 421 [97 P. 77].)' (*People* v. *Novell,* 54 Cal.App.2d 621, 623-624 [129 P.2d 453].)" ▮ Probable cause exists when there is present a suspicion based upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true (*People* v. *Brite,* 9 Cal.2d 666, 687 [72 P.2d 122].) ▮ It is also now established law that the officer's belief may be founded on credible information conveyed to him by others,

and is not limited to evidence that would necessarily be admitted at the trial on the issue of guilt (*Trowbridge* v. *Superior Court,* 144 Cal.App.2d 13, 17 [300 P.2d 222] and cases therein cited; *People* v. *Boyles,* 45 Cal.2d 652, 656 [290 P.2d 535]). ██ With the foregoing rules in mind, we are satisfied that under the circumstances here present, the officers were abundantly justified in taking appellant into custody. We have herein previously narrated in some detail the facts and circumstances with which the officers were confronted and it is unnecessary to here repeat them. Suffice it to say that the information the officers had coupled with the fact that appellant appeared to be under the influence of a narcotic due to his incoherent answers to questions propounded by the officers, were more than sufficient to generate in the mind of an ordinarily cautious and prudent person a conscientious and strong suspicion that appellant was guilty of not only the crime of robbery, a felony, and also to arrest him for a misdemeanor committed in their presence (Pen. Code, § 836, viz., violation of section 11721 of the Health and Safety Code which makes it an offense to be under the influence of narcotics). The cases of *People* v. *Thymiakas,* 140 Cal.App.2d 940 [296 P.2d 4]; *People* v. *Brown,* 45 Cal.2d 640 [290 P.2d 528]; *People* v. *Gale,* 46 Cal.2d 253 [294 P.2d 13], and *People* v. *Harvey,* 142 Cal.App.2d 728 [299 P.2d 310] relied upon by appellant are all factually distinguishable from the facts and circumstances present in the case now engaging our attention.

██ If, as we have concluded, the arrest and detention of appellant was lawful, there can be no question but that the crime of escape was completed with the unlawful departure of the accused from the limits of his custody (*People* v. *Quijada,* 53 Cal.App. 39, 41 [199 P. 854]). In the case at bar there was substantial evidence that appellant had been informed he was under arrest. Deputy Sheriff Tittle had attempted to handcuff him, whereupon he struggled with the officer, ran away and failed to stop when the officers commanded him to halt. From the foregoing it appears that appellant was in lawful custody and escaped therefrom.

Appellant's next assignment of error concerns the claim that the court improperly admitted into evidence statements made by various persons outside his hearing or presence upon the theory that such statements were part of the *res gestae.*
██ In this regard, our attention is directed to statements hereinbefore narrated made by Mrs. Lame describing what

she saw appellant do and of her conduct in running out into the street to secure police assistance because she believed appellant was about to commit robbery. Objection is also made to the conversation between Mrs. Lame and the witness Fowler. We have concluded that the hearsay objection cannot be applied to this evidence. ▌ The correct rule is thus stated in Wigmore, 3d edition, volume VI, section 1789, page 235: "Wherever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned." (Emphasis added.)

▌ Appellant's challenge to this evidence is unavailing. In considering the question of reasonable or probable cause upon the part of the officers to arrest appellant, the court is to look only at the facts and circumstances presented to the arresting officers at the time they acted. The conversations in question were not admissible as to their verity, but upon the question of whether they contained such information as would tend to show the good faith or probable cause on the part of the officers in arresting appellant (*Aitken* v. *White*, 93 Cal.App.2d 134, 135 [208 P.2d 788], and cases therein cited).

▌ In the instant case, when the taking of testimony was concluded, the court admonished the jury as follows:

"I let this evidence in, realizing it was hearsay, because I didn't know whether there would be a controversy which the jury would have to determine so far as the controversial facts are concerned. After hearing all the evidence, the Court has come to the conclusion that the officers were justified in making the arrest; that the arrest was valid; and, therefore, there is nothing for the jury to determine so far as that evidence is concerned, and I am going to instruct the jury that the evidence was received for the limited purpose, *and you are not to consider the evidence in any way whatever in determining the guilt or innocence of this defendant so far as the charge of escape is concerned.*" (Emphasis added.)

Furthermore, in view of the foregoing specific instruction given by the court, we are persuaded that no inference unfavorable to appellant could have been drawn by the jury from the conversations and that he suffered no prejudicial effect therefrom.

Finally, appellant urges that the court committed reversible error in refusing to submit to the jury the question of

whether the arresting officers had probable cause to believe the appellant had committed a felony and were therefore justified in placing him under arrest.

Appellant concedes that as a general proposition of law, "it is correct to state that probable cause is a question of law to be decided by the trial court rather than the jury," but contends, and rightly so, that this rule is applicable only where there is no conflict to be decided by the court (*People* v. *Kilvington*, 104 Cal. 86, 90-92 [37 P. 799, 43 Am.St.Rep. 73]; *Collyer* v. *S. H. Kress & Co.*, 5 Cal.2d 175, 181 [54 P.2d 20]; *People* v. *Brite, supra,* p. 687; *Murphy* v. *Murray*, 74 Cal. App. 726, 730 [241 P. 938]). As was said by this court in *Aitken* v. *White, supra,* page 141: "When the facts are controverted or the evidence conflicting, then the determination of their legal effect by the court is necessarily hypothetical, and the jury are to be told that if they find the facts in a designated way, then such facts do or do not amount to probable cause. (Citing cases.)" (See also *Roberson* v. *J. C. Penney Co.*, 136 Cal.App.2d 1, 4 [288 P.2d 275].)

In determining whether the issue of probable cause is one for the court or for the jury care must be taken to consider what types of conflicting evidence regarding probable cause require submission to the jury for determination of the facts upon which probable cause for arrest is based. This, because it is well established in our law that in determining this question, the court looks only at the facts and circumstances *presented to the officer at the time he was required to act* (*People* v. *Kilvington, supra,* p. 92-94; *People* v. *Hupp,* 61 Cal.App.2d 447, 449 [143 P.2d 84]; *Van Fleet* v. *West American Ins. Co.*, 5 Cal.App.2d 125, 129 [42 P.2d 378, 43 P.2d 557]; *Murphy* v. *Murray, supra,* p. 730). The conflict must concern the existence of the facts and circumstances upon which the officer based the arrest, and not such conflicts as are created by subsequent events. A good illustration of this situation is to be found in *Roberson* v. *J. C. Penney Co., supra,* page 1, where there was a direct conflict in the facts and circumstances present at the time the plaintiff therein was detained and restrained by defendants' employee, and the court held that the trial judge should have defined what facts as a matter of law constituted probable cause and then allowed the jury to determine whether these facts existed.

In the case now before us no such situation was present. Many facts, information and circumstances were presented to the officers at the time of the arrest, which were

uncontradicted. For instance, the information given the officers outside the presence of appellant by Mr. Fowler and Mrs. Lame was undisputed, and would serve as sufficient to warrant an arrest. By his own testimony, appellant admitted that he told the investigating officers nothing. What appellant testified to at his trial cannot be regarded as establishing a conflict in the evidence that required submission to the jury of the question of probable cause because such testimony was not before the officers at the time they were required to determine the legality of detaining appellant and therefore could shed no light upon the question of whether the officers were justified in placing him in custody (*People* v. *Brite, supra,* p. 687). At the time of appellant's apprehension the officers had been called by Mr. Fowler who told them a man was "holding up" a liquor store. This was at night. Upon their arrival at the liquor store the officers were accosted by Mrs. Lame, the night clerk at the establishment, who informed them that the appellant had come into the store with a "fierce" look on his face; had refused to speak to her; had wandered into the living area of the store where the owner kept valuables, after being told not to. At the time of the arrest, this information was undisputed by the appellant.

Further, the police officers testified that they found a jail envelope in appellant's possession of the type issued to narcotic suspects. This too, was undisputed. Our conclusion is that under the facts and circumstances present in the case at bar, the presence or absence of probable cause presented a question of law to be decided by the court since there was no conflict in the information given to the officers at the time they were required to act, and such information, coupled with the conduct of appellant, was sufficient to generate in the mind of a man of ordinary care and prudence an honest and strong suspicion that appellant was guilty of a felony.

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each is affirmed.

Fourt, J., concurred.

Doran, J., dissented.

Appellant's petition for a hearing by the Supreme Court was denied March 13, 1957. Carter, J., was of the opinion that the petition should be granted.