[Crim. No. 670   In Bank. — May 9, 1901.]

## THE PEOPLE, Respondent, v. GEORGE SUESSER, Appellant.

CRIMINAL LAW — MURDER — CHANGE OF VENUE — FAIR AND IMPARTIAL TRIAL — UNBIASED JURY NOT OBTAINABLE. — A defendant accused of murder is entitled to a change of the place of trial, where it appears that a fair and impartial trial by an unbiased jury cannot be had in the county in which the homicide occurred, by reason of the coercion of public opinion throughout the county against the defendant, by means of published statements of the facts from witnesses, and published commendations of the deceased and denunciations of the defendant, made in the church pulpits and in newspapers published throughout the county, so that the people of the county were practically unanimous in the opinion that the defendant deserved the punishment of death.

ID. — UNBIASED JURY ESSENTIAL TO FAIR TRIAL — NEWSPAPER REPORTS — DISCRETION — OPINION TO BE REMOVED BY EVIDENCE. — A fair trial cannot be had, except by an unbiased jury; and jurors who have an opinion that the defendant is guilty, which it would require evidence to remove, are disqualified, no matter what was the source of their knowledge of the facts of the case. The discretion given in applying the test whether newspaper reports preclude the impartiality of a juror, is not intended to deprive the defendant of the right to be tried by a jury which is in fact unprejudiced.

APPEAL from a judgment of the Superior Court of Monterey County and from an order denying a new trial.   N. A. Dorn, Judge.

The facts are stated in the opinion of the court.

Daugherty & Lacey, for Appellant.

Tirey L. Ford, Attorney-General, and H. A. Melvin, for Respondent.

TEMPLE, J.—The defendant was tried and convicted of murder in the first degree and sentenced to be hanged, and has appealed from the judgment and from an order refusing a new trial.

The principal point relied upon for a reversal is the refusal of the court to grant a change of venue upon the showing made by the defendant. Section 1033 of the Penal Code directs the trial court to grant the change when it is made to appear that a fair and impartial trial cannot be had in the county, and when, from any cause, no jury can be obtained in the county where the action is pending. So far as this case is concerned, both provisions mean the same thing. A fair trial cannot be had where an unbiased jury cannot be had, and a juror who has an unqualified opinion that defendant is guilty, founded upon a knowledge of material facts of the case, does not possess the common-law qualifications for a juror, and it does not matter how that knowledge was obtained, provided the juror believed it. Indeed, the rule went beyond this. A juror was disqualified if he had made positive and unqualified statements in regard to the guilt of the defendant; and to suppose that the majority of mankind would or could act as freely in the face of such statements made to neighbors and friends as he could if such statements had not been made, is to ignore human nature. It was said in *People* v. *Wong Ark,* 96 Cal. 136: "And when the constitution of this state guarantees to all the right of trial by jury, it means an impartial jury." It guarantees a common-law jury. (Cooley on Constitutional Limitations, 390; *People* v. *Powell,* 87 Cal. 348.) It is true that this test as to whether a proposed juror is impartial, and can try a cause uninfluenced by rumors and newspaper accounts, has been modified, and much is now left to the discretion of the trial court; but it is not intended by this to deprive any one of the right to be tried by a jury which is in fact unprejudiced. No more now than formerly is a defendant compelled to submit his case to a juror who has such an opinion of his guilt as it will require evidence to remove, and thus unjustly add to the burden of his defense. The force of this suggestion will be appreciated if we suppose the prejudice to have been the other way. Suppose the deceased, instead of being killed, had slain the defendant and without just excuse, and this same demonstration had been made in his favor,—all the newspapers, we may suppose, filled with de-

nunciations of the deceased and commendations of his slayer,
— and suppose the jurors, when called one by one, as in
this case, had all, or nearly all, testified that they had formed
strong opinions from what they had read and heard in favor
of the prisoner, and, if taken as jurors, would commence the
trial with opinions in favor of the defendant which it would
take evidence to remove, and yet each juror should testify that
he could fairly try the defendant and determine the case un-
influenced by his opinion,— could any one believe that a ver-
dict of guilty could be obtained from such a jury? The very
atmosphere pervading the community would forbid it. And
yet the coercion of public opinion is a thousand times stronger
in this case than it would have been in the case supposed.

The defendant, to say the least, was a person of no consid-
eration in the community. He had been arrested before for
trifling offenses. He is said to have been an idler, addicted to
drink. . He made his living principally by hunting. He had
been arrested on a charge of petit larceny, made by one De-
laney. On the evening of September 18, 1899, he went to the
dwelling-house of Delaney at Salinas, and, calling him to the
door, assaulted him. He afterwards fired several shots at the
house, and set fire to a haystack on the premises.· A fire
alarm was turned in, and naturally the people were much
excited.

The deceased was sheriff of the county, a young man much
esteemed. It is said he was the most popular man in the
county. Upon hearing the alarm of fire, and upon learning
something in regard to the conduct of Suesser, the sheriff
went with others to prevent further trouble. Whether he at
first designed to arrest Suesser does not appear. Going to the
house of Suesser's parents, they found Suesser with a gun,
and his parents and sisters trying to persuade him to remain
at home. They heard Suesser with an oath declare that he
would go and kill some person, probably Delaney, or Allen,
who had served a warrant upon him. The sheriff addressed
him, saying, "No; you won't," and advised him to remain at
home. He asked him, " Do you know me, George?" Defend-
ant replied with a vulgar oath, " Yes; and I will shoot you
too." The sheriff then said, " George, behave yourself. .I
will shoot. I will shoot." Suesser immediately fired, killing
Farley.

The affidavits upon which the motion for a change of venue

was based state that the homicide was in the presence of several persons, who have detailed the occurrence for the public press, and such reports have been circulated throughout the county.   Upon the arrest of defendant, which was shortly after the homicide, a large concourse of people gathered on the streets, which was composed of citizens of standing and repute.   These openly threatened to lynch the defendant, and he was saved from mob violence by hurrying him in a carriage at breakneck speed through the streets of the city, and before reaching the jail the officers were met by another crowd bent upon violence, who were defeated only by dashing into a side street and going out of the city.   In the morning early the prisoner was secretly lodged in jail, around which a crowd gathered, who threatened to break into the jail and hang the defendant.   Fearing this, the officers clandestinely removed defendant from the county.   He was brought back for a preliminary examination on October 11th, and the examination was held at the sheriff's office, rather than at the office of the justice of the peace, for fear of further violence, and it is stated "that the defendant has been denounced in the church pulpits and in the public press, and the opinion is practically unanimous in Monterey County that no punishment but death is deserved by the defendant."

The accounts published in the papers are appended as exhibits.   Their nature is not overstated in the affidavits.   It was natural that the greatest indignation and sorrow should be expressed.   Their sheriff was killed in the performance of his duty,— in fact, in protecting the people of the city from the acts of an incendiary, who, while the fire set by him was still raging, was heard to declare his intention to take the life of a citizen.   First vainly attempting to persuade the defendant, as was reported, to remain at home, and to abandon his homicidal intent, he endeavors to make the arrest.   He was then shot down in the presence of several citizens by this, as represented, most desperate criminal.

Many affidavits and considerable testimony were submitted by the defense, and there was a counter showing.   This amounted to little more than a showing that after the lapse of a few days the excitement abated, and there was no real intent to lynch the defendant.   Also, that there was not so much excitement in the remote parts of the county.   That but one opinion in regard to the guilt of the defendant existed through-

out the county, is admitted. There was no pretense that such opinion had changed, but only that the feeling against the defendant was less intense.

The motion was renewed after the examination of the panel on *voir dire* as to their qualifications, and was again denied. So far as the record shows, if I make a correct estimate, sixty-eight jurors were examined, and all, except eight, had formed an opinion as to the guilt of the defendant. So far as appears, all were against the defendant. Of the eight who had not formed opinions, two were excused because opposed to capital punishment, and one had not been assessed. This left five. Perhaps five to sixty would not unfairly divide the county between those who had not formed opinions and those who had. In fact, it is hard to understand how any one, who had heard the reputed acts as coming from several eye-witnesses, could fail to form an opinion against the defendant.

Most of the twenty peremptory challenges allowed the defendant were exercised upon proposed jurors, who stated upon *voir dire* that if sworn as jurors they would take their seats in the box with a strong opinion against the defendant which it would require evidence — some said strong evidence — to remove. Where such a state of things exists, the defendant cannot have a fair and impartial trial. If the change of venue should not be granted in this case, I think the statute should be repealed. Why courts should hesitate to grant change of venue in a proper case, I cannot understand. It seems that many, perhaps most, of the merchants and business men of Salinas made affidavits of the nature I have stated above to prevent such change. Why? Was it feared the defendant would escape if he were allowed a fair trial? It is suggested that there is undue delay in reaching final judgment. Those who complain of delay have prejudged the case, but delays are too often caused by plain disregard of obvious rights of friendless and unpopular defendants.

The attorney-general says the opinions formed by jurors were based upon rumor or newspaper reports; but there never was any real conflict about the occurrences at the time of the homicide. They were not denied. The opinions were therefore based on the facts as developed at the trial. The defendant testified that he was unconscious, and had no memory of what occurred.

Reference is made to the cases of *People* v. *Goldenson*, 76 Cal.

328; *People* v. *Fredericks*, 106 Cal. 554; and *People* v. *Durrant*, 116 Cal. 179. One reason for affirming the order in these cases was, that leave was given to renew the motion when, on an attempt to impanel a jury, the state of mind would be shown. Here, the motion was so renewed. These cases arose, too, in a populous city, where there were over three hundred thousand inhabitants. But it will be observed that in each case the writer of the opinion would have been better satisfied if the motion had been granted. I admit that much discretion is left in this matter to the trial court.

There are other questions in the case, but if it is to be sent back with directions to grant the change of venue, a new trial will necessarily result, and such matters will be unimportant.

The judgment is reversed, and the trial court is directed to grant the motion for a change of venue for the purposes of a new trial, which is ordered.

Van Dyke, J., Henshaw, J., Harrison, J., and Beatty, C. J., concurred.

McFARLAND, J., concurring.—I concur in the judgment and in the opinion of Mr. Justice Temple. It is not improper, however, to say that while appellant's counsel do not claim that he was not guilty of some crime, they do contend, with at least some plausibility, that he committed the homicide under a state of wild excitement and frenzy produced by causes entirely disconnected with the deceased, and not necessary to be here detailed, which show the absence of that deliberation and premeditation necessary to constitute murder in the *first degree*.