[Crim. No. 5212. In Bank. Oct. 15, 1951.]

THE PEOPLE, Respondent, v. JAMES McKAY et al., Appellants.

Rupert Crittenden and Kennedy Jackson, under appointment by the Supreme Court, for Appellants.

Edmund G. Brown, Attorney General, Doris H. Maier and Wallace G. Colthurst, Deputy Attorneys General, for Respondent.

TRAYNOR, J.—Defendants James McKay and Robert Sturm, 18 and 19 years of age respectively, escaped from a Youth Authority camp at Whitmore in Shasta County. They went to Seattle, where they were arrested and detained. Earl Sholes, undersheriff, and Dan Heryford, a deputy sheriff of Shasta County, took custody of defendants in Seattle. On the return trip by automobile the two officers rode in front, the two defendants in back. Each defendant was handcuffed separately with his hands in front of him. While the automobile was traveling through a sparsely inhabited mountain area each defendant lunged forward on a prearranged signal and struck the officer directly in front on the head and shoulders. During the struggle the car skidded to a stop, and one of the defendants secured one of the officers' guns. The officers were shot and fatally wounded, and their bodies dragged down an embankment by the side of the highway. Defendants removed various articles from the officers' clothing and then fled in the car. They were apprehended the following day. There is a conflict in the evidence as to the way in which the shots were fired and by which defendant and as to whether the homicides were a premeditated or spontaneous part of the escape plan. The jury found defendants guilty of two counts of murder of the first degree without recommendation.

Defendants contend that the trial court committed prejudicial error in denying their motions for a change of venue. (See Pen. Code, §§ 1033-1035.) ▮ A motion for a change of venue on the ground that a fair and impartial trial cannot be had in the county is addressed to the sound discretion of the trial court. (*People* v. *Cullen, ante,* pp. 614, 627 [234 P.2d 1], and cases cited.) ▮ When the facts demonstrate that such a trial cannot be had "an order must be made transferring the action to the proper court of some convenient county free from a like objection." (Pen. Code, § 1035; *People* v. *Suesser,* 132 Cal. 631, 635 [64 P. 1095]; *People* v. *Yoakum,* 53 Cal. 566, 571.) We have concluded in the light of the

circumstances established by the record that this is such a case.

■ The decedents were well known, popular officers of a small county.' Defendants were strangers with bad reputations. The homicides were given extensive and continuing publicity in the local newspaper, which was widely circulated in the county. The accounts of the crime emphasized the fact that defendants had confessed. At the time of the crimes the community was thoroughly aroused, there was talk of lynching, and defendants were taken to the state prison for safekeeping. Although affidavits filed in opposition to the motions for change of venue stated that by the time of trial the feeling of public indignation had considerably cooled, they did not deny the existence of widespread bias and prejudice against defendants. When defendants moved to disqualify Judge Ross of the Superior Court of Shasta County he stated that if he were conducting a trial without a jury "then perhaps the things stated by the defense would constitute a disqualification." He was prohibited from proceeding with the trial of the cause. (*McKay* v. *Superior Court,* 98 Cal.App.2d 770 [220 P.2d 945].) At the time the trial was originally commenced before Judge Ross and at the time it was continued before Judge Jones, who was assigned to the case from Lake County, no available member of the Shasta County bar was sufficiently free from bias or prejudice to participate in the defense. At the time of trial one of the local attorneys, after stating reasons why he should not serve, said, "Despite that situation, feeling as I do the responsibility with which the attorneys here and myself are burdened in such an unhappy situation, I would be willing to do my best to act as attorney for these boys or either one of them, knowing that it is not a popular thing to do, knowing that maybe in the defense of these boys I might offend a friend whom I revere, but despite that I would accept it." One of the defense attorneys appointed from outside the county was unable to find any local citizen who would execute an affidavit in support of the motions for change of venue. All of the more than 20 persons he interviewed stated that the vast majority of persons in Shasta County believed defendants guilty and thought they should receive the extreme penalty. All of them, however, refused to execute affidavits to that effect because of the criticism it would engender.

Public indignation against defendants was further aroused by the publicity given to a letter written by Judge Ross to

the board of supervisors. At the time Judge Ross appointed counsel for defendants, he suggested to them that some provision could probably be made to reimburse them for the expenses that would be incurred because they would have to come from a distance to undertake the defense. After these counsel were successful in having Judge Ross prohibited from proceeding with the case, some of them filed a claim with the board of supervisors for expenses. Judge Ross wrote the board of supervisors that the claim should not be paid. After giving the history of the case before the opening of the trial before him, Judge Ross wrote:

"On the morning of July 18, with 125 jurors waiting to be called and for the trial to commence, the attorneys asked to confer with me in my office before going into court. They then said they were going to file affidavits of prejudice against me so that I would have to call in another judge to preside. They stated that they had nothing personal against me and considered that I would be fair and impartial, but that they owed this duty to their clients. I asked if that meant they were going to waive a jury trial when a new judge was brought in, and they said they would have to see about that later and that the first step was to get a new judge in for the case. I called their attention to the fact that 125 jurors were getting $5 per day and mileage to be there, and they just shrugged their shoulders.

"We then went into court and they filed affidavits of prejudice against me. I asked in open court if they intended to waive a jury if a new judge came in and remade my offer to voluntarily step out without admitting disqualification in case of a waiver of jury or a plea of Guilty. They would not state what their plans were. (I had in mind that all four attorneys had stated in our conferences in my office many times that they had gone over the case with the defendants, and that there was no question of the guilt of both defendants of the crime of murder and that their only hope was to get them off with life imprisonment, although they might try to argue to a jury that it was only second degree murder.)

"Under the law all I could do was to have the Judicial Council in San Francisco get some other Superior Court Judge to come in and pass on my disqualifications. Therefore, on July 19th, Judge Warren Steel of Marysville came up and heard both sides of this matter and decided that there was nothing in the record to show that I was disqualified.

"We proceeded with the case on the 20th and 21st, and on

the 25th and 26th of July, and had almost succeeded in selecting a jury for the trial when a writ of prohibition from the appellate court halted us. This was heard on August 2d in Sacramento, and on the 3d the appellate court held that I was disqualified.

"Although we must obey this decision, it was wrong and I was not actually disqualified, and all four attorneys for the defendants at one time or another admitted this to me. They therefore did what they did apparently for delay of the case and to make it as expensive on the county as they could. Nothing they did was directed towards having a trial on legal evidence to decide whether McKay and Sturm did or did not commit murder. I therefore feel that they are not entitled to be paid anything for what they have done in this case."

Judge Ross's letter was printed in the local paper in its entirety approximately two weeks before the trial commenced before Judge Jones, and the part referring to the unanimous opinion of defense counsel that defendants were guilty was reprinted at the time the jury was being selected.

A jury and two alternates were selected with difficulty after 10 trial days and the examination of approximately 251 possible jurors. Although all peremptory challenges were exhausted, there remained on the jury persons familiar with the publicity given the case, including Judge Ross's letter.

It has recently been held that "The popularity of the decedent, the fact that the inhabitants are well known to each other in a small county, and the customary newspaper publicity, do not necessarily warrant the granting of a motion for change of venue." (*People* v. *Mendes*, 35 Cal.2d 537, 542 [219 P.2d 1]; see, also, *People* v. *Brite*, 9 Cal.2d 666, 689-690 [72 P.2d 122].) In the present case, however, a much more compelling showing has been made that defendants could not receive a fair and impartial trial in Shasta County. The record is replete with evidence, not only of general bias and prejudice against defendants, but of antagonism so intense that the local citizens hesitated or refused to take part in any effort directed toward securing to defendants their legal rights.

Although it may be true that the feeling of substantial citizens at the time of the crimes that "the courts should not waste time on persons such as [defendants], but that instead [they] should be lynched and 'strung up,'" had cooled by the time of the trial, the record demonstrates that it had

been replaced by a cool, widely held conviction that defendants were guilty and should be tried and sentenced to death as expeditiously as possible. The community was determined that defendants be given no quarter. In no other way can be explained the antagonism toward defense counsel or the fact that "all of said persons with whom [defense counsel] talked refused to make an affidavit concerning said public feeling and requested that [defense counsel] not disclose their names, upon the ground that they believed they would be criticized by their friends, customers and other persons of Shasta County."

The countershowing offered in affidavits presented by the prosecution created no real conflict with the evidence presented by the defense. In his affidavit in opposition to the motions for change of venue the sheriff stated, "That the feeling of public indignation and resentment that existed against James McKay and Robert Sturm up to the time when they were transported from Folsom State Penitentiary to the Shasta County Jail on June 3, 1950, has subsided and cooled considerably since that date and the only public feeling of indignation that exists now in Shasta County in connection with the killing of Earl Sholes and Dan Heryford is a cool, calm and wholesome feeling that justice be administered in the murder action now pending against James McKay and Robert Sturm." Other affidavits were of similar import. The countershowing was essentially similar to that made in *People* v. *Suesser*, 132 Cal. 631, 634 [64 P. 1095], where the court said, "This amounted to little more than a showing that after the lapse of a few days the excitement abated, and there was no real intent to lynch the defendant. Also, that there was not so much excitement in the remote parts of the county. That but one opinion in regard to the guilt of the defendant existed throughout the county, is admitted. There was no pretense that such opinion had changed, but only that the feeling against the defendant was less intense. . . .

"Where such a state of things exist, the defendant cannot have a fair and impartial trial. If the change of venue should not be granted in this case, I think the statute should be repealed. Why courts should hesitate to grant change of venue in a proper case, I cannot understand. It seems that many, perhaps most, of the merchants and business men of Salinas made affidavits of the nature I have stated above to prevent such a change. Why? Was it feared the defendant

would escape if he were allowed a fair trial? It is suggested that there is undue delay in reaching final judgment. Those who complain of delay have prejudged the case, but delays are too often caused by plain disregard of obvious rights of friendless and unpopular defendants.''

In view of the prevailing atmosphere in the community, the fact that from 251 persons it was possible to select 14 who thought they could try the case fairly does not sustain the conclusion that a fair trial could be had. Because they had exhausted all of their peremptory challenges defendants were forced to go to trial before jurors who were familiar with the publicity that had been given to the case. One juror stated that she took it for granted that the officers were murdered by defendants. Another knew one of the decedents by sight, and a third knew all the members of a family that was related to one of the decedents. This juror's husband also worked part time as a deputy sheriff. Another juror testified that Mr. Heryford, one of the decedents, ''belonged to an old Shasta County family as I do myself and I know of him. . . .'' Moreover, none of the jurors could have been unaware of the popular feeling. They knew, just as the local attorneys knew, that any verdict other than guilty without recommendation would be highly unpopular in the community. They, just as the citizens who refused to execute affidavits, had to continue living with their neighbors.

 Because of the abundant evidence of guilt, it is contended that defendants could not have been prejudiced by the widespread antagonism against them. Regardless of their guilt, however, they were entitled to a fair and impartial trial. (*Moore* v. *Dempsey*, 261 U.S. 86, 87-88, 92 [43 S.Ct. 265, 67 L.Ed. 543] ; see concurring opinion of Mr. Justice Jackson in *Shepherd* v. *Florida*, 341 U.S. 50 [71 S.Ct. 549, 95 L.Ed. 740].) ''Neither can a plea for the application of [Article VI, section 4½] of the constitution save this situation. The fact that a record shows a defendant to be guilty of a crime does not necessarily determine that there has been no miscarriage of justice. In this case the defendant did not have the fair trial guaranteed to him by law and the constitution.'' (*People* v. *Mahoney*, 201 Cal. 618, 627 [258 P. 607].)

Moreover, the jury was presented with the problem of determining the penalty to be imposed. Had one of the defendants been one month younger and the other approximately one year younger the death penalty could not be

imposed. (Pen. Code, § 190.) The considerations that led the Legislature to provide that no murder committed by a person under 18 years of age should be punishable by death might lead a jury to recommend life imprisonment for defendants slightly over that age. By law the determination of the penalty is left solely to the discretion of the jury (Pen. Code, § 190), and accordingly, it was of vital importance that they should exercise that discretion free from bias, prejudice, or pressure from the community.

Not only was such freedom of deliberation denied to the jury, but at least some of its members were aware of the statements made by Judge Ross in his letter to the board of supervisors. One juror testified as follows:

"Q. You say you did read the Judge's letter? A. Yes.

"Q. Was there anything in that letter that would cause you to form an opinion one way or the other concerning the guilt or innocence of the defendants? A. No. I figure—well, I don't know just how to answer that. As far as making up an opinion. Judge Ross made quite a statement as far as that goes. . . .

"Q. . . . Would you say from the recollection of the letter Judge Ross wrote that the Judge expressed himself concerning the guilt or innocence of the defendants? A. Well, I would say he expressed himself, yes."

Judge Ross's letter not only stated that all defense counsel conceded defendants' guilt, but also bitterly attacked the methods of the defense. If his statements had been made by a judge presiding at the trial they would clearly have required a reversal. (*People* v. *Mahoney,* 201 Cal. 618, 626-627 [258 P. 607].) " 'It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.' " (*Sanguinetti* v. *Moore Dry Dock Co.,* 36 Cal. 2d 812, 819 [228 P.2d 557], quoting from *Starr* v. *United States,* 153 U.S. 614, 626 [14 S.Ct. 919, 38 L.Ed. 841].) Judge Ross was well known in the county and had been the only regular superior court judge for approximately 17 years. In the latest election he had received the highest number of votes of any county officer. His opinions were known to members of the jury. Under such circumstances the prejudical effect of his statements was not materially less because they were made outside rather than inside the courtroom.

It is unnecessary to determine which, if any, of the facts and circumstances of this case standing alone would require the granting of a motion for change of venue. When local feeling is so intense that the presentation of defendants' case is impeded, members of the jury are familiar with the facts in advance of the trial and are aware of the intense antagonism of the community toward defendants, and the regular trial judge has forcefully presented his opinions as to the merits of the case and attacked the good faith of defense counsel, a change of venue should be ordered. However conscientious the members of the jury may have been, it cannot reasonably be concluded that they could so divorce themselves from their past experiences and present surroundings that a fair and impartial trial could be had.

"The prisoner, whether guilty or not, is unquestionably entitled by the law of the land to have a fair and impartial trial. Unless this result be attained, one of the most important purposes for which Government is organized and Courts of Justice established will have definitely failed. Cases sometimes occur, and this would appear to be one of them, in which the very enormity of the offense itself arouses the honest indignation of the community to such a degree as to make it apparent that a dispassionate investigation of the case cannot be had. Under such circumstances the law requires that the place of trial be changed." (*People* v. *Yoakum,* 53 Cal. 566, 571.)

The judgments and the orders denying the motions for a new trial are reversed and the trial court is directed to grant the motions for change of venue.

Gibson, C. J., Shenk, J., Edmonds, J., Schauer, J., and Spence, J., concurred.

Carter, J., did not participate.