[Crim. No. 12057. In Bank. Aug. 28, 1970.]

THE PEOPLE Plaintiff and Respondent, v.
WILLIAM TIDWELL, Defendant and Appellant.

64

**COUNSEL**

Peter Heintz, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Jack R. Winkler, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PETERS, J.** — Defendant and his brother Robert Tidwell were indicted for the murders of Jessee Levoy DeForest, Mary Jeanette De-Forest, and Keith Eugene Utterback. Following separate trials by jury, both defendant and his brother were convicted of first degree murder on all three counts and sentenced to death. Defendant's motions for a new trial and for reduction of the penalty were denied, and his automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)[1]

We have concluded that the trial judge erred prejudicially in denying defendant's motions for a change of venue, and hence that his judgment of conviction must be reversed.

The bodies of Levoy and Jeanette DeForest were found at their ranch near Susanville in Lassen County. Their 1962 Chevrolet was missing; a stolen 1963 station wagon from Redding was in its place. Three days later, their vehicle was located at Boggard Buttes, also in Lassen County. In the front seat was the body of Keith Utterback. Defendant and his brother were indicted after a search of their apartment disclosed evidence linking them to the crimes.

Defendant and his brother were strangers to Lassen County, which has a population of 17,500. The newspaper and radio news stories sub-

---

[1]The automatic appeal of Robert Tidwell is considered in a separate opinion, *post,* page 82.

mitted in support of the brothers' joint motion for a change of venue indicate that at least one of the crimes with which they were charged was sufficiently brutal to lead investigating authorities to tell newsmen they were looking for a " 'Jack or Jacqueline the Ripper.' " Two of the victims, the DeForests, were well-known in the community. Mr. DeForest was described in one news release as "a member of one of the oldest families in the Honey Lake Valley." He was survived by several siblings in the area, including a sister who was married to Lassen County Sheriff Ben Yeakey—who himself figured prominently in news stories of the investigation of the crimes. Mrs. DeForest worked at a drugstore in Susanville, and was known to many members of the community.

Investigating officers kept the press, and hence the public, apprised of virtually every step in the progress of their investigation. When the Tidwells were arrested, radio and newspaper releases relayed investigators' reports that articles belonging to the victims were found in the Tidwells' possession. A substantial portion of the prosecution's evidence at trial was presented first to the public through press and radio news reports. Radio and newspaper releases carried a report that District Attorney Harold Abbott said defendant's brother gave a statement which "comes under Supreme Court rulings saying when one defendant makes a statement implicating another they must have separate trials."[2]

District Attorney Abbott was also reported to have estimated the costs of trial at from $30,000 to $50,000, and he became involved in a widely publicized dispute with the Lassen County Board of Supervisors over his request that his "always . . . overcrowded" office be expanded lest handling the Tidwell trial would become " 'impossible.' " One article in the Lassen Advocate reported that a decision by the board of supervisors to finance trial costs out of a general reserve fund "ended speculation that $50,000 would be tacked on to the fiscal 1967-68 budget, adding 18 cents to the tax rate." Radio and newspaper releases gave wide coverage to District Attorney Abbott's plea—which he addressed to the sheriff's office but also released to the press—that "It is absolutely imperative that pretrial publicity and publicity during the trial, so far as your department and my department are concerned, be held to an absolute minimum. Otherwise, if the case is tried in Lassen County and the publicity is one-sided and there is too much of it, the convic-

---

[2]The quoted language is from a United Press International news release broadcasted at least three times on September 21, 1967, over several radio and television stations covering all of Lassen County. The language of the newspaper story, carried on the same day by the Lassen Advocate, was that District Attorney Abbott "told the court yesterday the evidence—statement by the younger Tidwell—comes under a supreme court decision, which says that when one defendant has made a statement implicating the other they are entitled to separate trials."

tion will be reversed and all of the Lassen County expense will be for naught. [¶] If we have too much publicity before trial, the court will move the trial to some county other than Lassen. . . ."

Defendant's appointed attorney's affidavit in support of the venue change motion averred that on each occasion he referred to his appointment in public, he received rejoinders varying in hostility from " 'I don't envy you your impossible job' " to " 'Why don't they just turn them loose, we'll take care of them,' " but uniformly disclosing an opinion that the Tidwell brothers were guilty.

An affidavit of George Shier averred that he was retained by counsel for defendant and his brother to ascertain "the attitude of the general public concerning the possibility of a fair and impartial trial," that he interviewed over 500 adults in "all parts of the county," that "most of the individuals questioned professed to know more about the particular case than did affiant," that in many areas he was met with "outright hostility and contempt," and that "the following are typical first expressions received by him from people interrogated: [¶] 'Why are you wasting the taxpayers' money by even giving these boys a trial?' [¶] 'They have confessed, why waste your time.' [¶] 'The police have found property belonging to the victims in the hands of these defendants, therefore its [*sic*] and [*sic*] open and shut case, of course they are guilty.' "

Finally, the Shier affidavit averred "That of all the persons interviewed only five had not heard the case discussed at all; that all but thirteen had heard or viewed the matter over radio or television; that all but five had listened to reports and other news releases over the radio; that all but thirty-one had discussed the matter with their friends, and acquaintances, and had expressed opinions concerning the guilt or innocense [*sic*] of these defendants; that the vast majority of the persons interviewed were of the opinion that they would be unable to set aside the views they held and try the case fairly on the basis of the evidence in court."

To counter defense counsel's showing, the district attorney averred that he had had sheriff's deputies "obtain affidavits from adult persons throughout the County of Lassen," and that over 90 percent of those contacted (about 65) executed affidavits to the effect that in spite of pretrial publicity they believed the defendants could obtain a fair trial. Twelve of the affiants are apparently husband and wife.

The trial judge denied the joint motion for a change of venue after reviewing this evidence. Defendant separately renewed his motion fol-

lowing the selection of his jury—a process which took four full days of *voir dire* during which 102 veniremen were questioned. All 72 of the prospective jurors who were asked said they had heard news of the case. Of 57 prospective jurors who were asked, 47 had discussed the case. Of 68 prospective jurors who were asked, 21 admitted in open court that they had formed an opinion concerning the defendant's guilt. Of 21 asked, 13 replied that they could not set aside this opinion. Of 79 who were asked, 22 knew one or more of the victims. Of 89 who were asked, 67 knew witnesses. Of 67 who were asked, 21 conceded that their acquaintance with victims or witnesses would affect their decision.

The court granted 13 challenges for cause lodged against jurors who admitted that they could not disregard their opinion, formed on the basis of news reports, that the defendant was guilty. Twelve challenges were granted when jurors admitted that their relationship with witnesses rendered them partial, seven challenges were granted to excuse jurors who admitted their relationship with victims would affect their deliberations, and two challenges were granted when jurors admitted that their prior association with victims and witnesses would hinder their fairness.

After defendant exhausted his 20 peremptory challenges, he was left with a jury composed of 12 people who had heard of the case, and presumably, were already familiar with highly publicized prosecution evidence. Of the 12, at least 10 had discussed the case with friends or fellow workers. Eight knew one or more witnesses, and four knew one or more of the victims. Of the four jurors who knew victims, juror Kanavel testified that "Mr. DeForest was putting up our hay when this matter occurred," and that once she learned the reason for his failure to appear for work, the attention of her entire family was focused on the progress of the investigation of the crimes. Juror Corder remembered Mrs. DeForest as the lady who "worked in the drug store, and she waited on me, . . ." Juror DeVose knew the DeForests "casually"; juror Sorenson knew Mrs. DeForest "by sight."

Of the eight jurors acquainted with witnesses, three knew Sheriff Yeakey who controlled the investigation of the murders, who had personal knowledge concerning items which were missing from the home of his brother-in-law, and who ultimately played a prominent role in the prosecution's case-in-chief. Juror DeVose considered the sheriff his "lifetime friend." Juror Gerspacher had seen Dr. McCullough—who performed the autopsies and testified in detail with regard thereto—in his professional capacity; juror DeVose knew him as his "family doctor." Jurors Mason, Sanford, and Kanavel indicated that they knew some of the prosecution witnesses, but did not specify which ones they knew. Juror Ceaglio was a long-

standing friend of the deputy who collected and authenticated over a fourth of the prosecution's exhibits—including photographs of footprints and items found at the scene of the third murder which connected the crimes and helped inculpate defendant. In addition, jurors Corder and Cealigo knew surviving members of the DeForest family (juror Corder had "business acquaintanceships" with Mr. DeForest's brothers), one member of which testified to finding the DeForests' bodies and to the condition of the premises.

The trial judge denied the renewed venue change motion.

██ Settled law requires in a case tried as this one was, before *Maine* v. *Superior Court,* 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], but after *Sheppard* v. *Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], that we conduct an independent review of all relevant circumstances to determine whether a trial judge's denial of a motion for a change of venue deprived defendant of a fair and impartial trial. (*People* v. *O'Brien,* 71 Cal.2d 394, 400 [78 Cal.Rptr. 202, 455 P.2d 138, 456 P.2d 969].)

██ At the outset, it must be noted that defendant's failure to seek review by mandate prior to his trial in no way limits his right to relief.

*Maine* held for the first time that mandate will lie prior to jury selection to review the denial of a venue change motion. (68 Cal.2d at p. 381.) *Maine* noted that "[i]t has long been the practice, sanctioned in the decisions of this court [citation], to permit the trial court to defer its final ruling on a motion for a change of venue until the jury is empaneled." (*Id.,* at p. 380.) We recognized that mandate should lie only in advance of jury selection to avoid disruption of "the orderly progress of a trial," and established that "[i]f the appellate court denies the application [for mandate] *or if appellate review is not sought,* defense counsel can continue under the previous practice, to renew his motion for a change of venue during or after the *voir dire* examination of prospective jurors, and the trial court should order a venue change if the situation so merits." (68 Cal.2d at p. 381; italics added.) Should the trial court deny the motion, the same standard "will be applied on direct review in all cases which have not proceeded to trial at the date this opinion becomes final." (*Id.,* at p. 384, fn. 9.) We have always permitted defendants to attack a denial of a motion for change of venue on appeal (*People* v. *McKay,* 37 Cal.2d 792 [236 P.2d 145]; *People* v. *Suesser,* 132 Cal. 631 [64 P. 1095]; *People* v. *Yoakum,* 53 Cal. 566; *People* v. *Lee,* 5 Cal. 353), and have done so since *Maine* without requiring an appellant to show that he first sought mandate unsuccessfully (*People* v. *O'Brien, supra,* 71 Cal.2d 394).

Defendant followed settled procedure—still appropriate after *Maine*—and his failure to anticipate *Maine's* decision that mandate will lie cannot be invoked against him. (*In re Gladys R.,* 1 Cal.3d 855, 861 [83 Cal.Rptr. 671, 464 P.2d 127]; *In re Dabney,* 71 Cal.2d 1, 11-12 [76 Cal.Rptr. 636, 452 P.2d 924]; *In re Caffey,* 68 Cal.2d 762, 773 [69 Cal.Rptr. 93, 441 P.2d 933].) Hence our responsibility in the present case is not diminished, and applicable criteria are not diluted, by defendant's failure to seek mandate.

*Maine* held that a change of venue must be granted whenever a defendant demonstrates a "reasonable likelihood" that in the absence of a venue change a fair trial cannot be had. Although we declined to apply the "reasonable likelihood" standard to cases which went to trial before *Maine* became final, we recognized that in such cases we have a clear responsibility under federal decisions prior to *Maine* to ensure that a denial of a venue change did not deprive a defendant of an impartial trial. (68 Cal.2d at p. 382; see also *People* v. *O'Brien, supra,* 71 Cal.2d at p. 400.) This responsibility extends "the nature of the inquiry far beyond the validity of trial court discretion" and requires that we "make an *independent evaluation* of the circumstances . . . [to] satisfy [our]selves *de novo* on all the exhibits and affidavits that every defendant obtains a fair and impartial trial." (*Ibid.;* italics in the original.) Such an evaluation cannot be avoided by requiring a defendant to make a specific showing of prejudice. (*Maine* v. *Superior Court, supra,* 68 Cal.2d at pp. 380, 382.)

Accordingly, as this case was tried after *Sheppard* but prior to *Maine,* we must examine all relevant factors and decide whether, on balance, we would expect a trial conducted under the circumstances to live up to our system's concept of an impartial adjudication of guilt. If, on balance, we would have granted a change of venue were we in the trial judge's place, we must reverse his denial of a venue change. In post-*Maine* cases, of course, we must reverse not only when a preponderance of circumstances calls for such a result, but also whenever a defendant has shown even a "reasonable likelihood" that he will not receive a fair trial.

The Attorney General intimates that inflammatory news articles must excite community hostility almost to a fever before this court would reverse a venue change denial prior to *Maine.* Of course, we have not been so insensitive to the many factors which may threaten the impartiality of a trial as to confine ourselves to such a narrow inquiry. In *People* v. *McKay, supra,* 37 Cal.2d 792, we reversed a judgment carrying a death penalty for failure to grant a change of venue even though the community's overt rage had, by the time of trial, "been replaced by a cool, widely held conviction that

defendants were guilty and should be tried and sentenced to death as expeditiously as possible." (*Id.,* at pp. 796-797.) And although *Maine's* prospective standard makes venue changes more easily available than under earlier standards, factors considered in that case are obviously relevant to cases which must be assessed by those earlier standards. Thus it is significant here that in *Maine* press coverage was neither inflammatory nor particularly productive of overt hostility.

The circumstances we relied upon in *Maine* to order a venue change included the fact that defendants were strangers in the small community in which they were charged with committing brutal crimes against prominent and popular victims. Local law enforcement officials' commendable attempts to keep details from the press were frustrated by an out-of-state report of one defendant's confession. Press coverage was not inflammatory, although it included support for a successful fund drive to defray the surviving victim's medical expenses. The final factor we noted was that the defense attorney and the prosecutor were opponents in an upcoming judgeship election.

As in *Maine,* defendant and his brother Robert were strangers to the locale of the three murders of which they were accused. The murders occurred in Lassen County, whose population is slightly over one-third as large as that of Mendocino County, the site of the murders in *Maine.* (See Appendix A, *Whittaker* v. *Superior Court,* 68 Cal.2d 357, 373-374 [66 Cal.Rptr. 710, 438 P.2d 358].) And, as in *Maine,* the victims included well-known members of the community and the murders were brutal. And, unlike the commendable restraint exercised by local law enforcement officials in *Maine,* here the press and public were apprised of virtually every detail in the investigation of the crimes. As a result, a good deal of the prosecution's case was presented out of court before the trial.

Although there was no report of a "confession" per se, news of a statement from defendant's brother Robert implicating defendant did reach the press by way of the district attorney's public explanation of the necessity for separate trials. The defense affidavits presented in support of the original venue change motion indicate that this circumlocution was not lost on the public, and that the district attorney might just as well have said one defendant confessed that both were responsible for the murders. When coupled with a report that defendant's brother cut his wrists in jail, and with pervasive reports that a host of clues linked the brothers to the crimes, the report that Robert implicated defendant is at least as damaging—if not more so because less probative of remorse—as a report that defendant had confessed.

Finally, although trial participants here were not competing election candidates as in *Maine*, news items indicate that there was considerable political debate concerning the fiscal impact of the trial.

In addition to factors paralleling those in *Maine*, the trial judge in the instant case was presented before *voir dire* with persuasive evidence that a fair trial could not be had in Lassen County. The defense affidavits disclosed substantial and widespread community hostility toward the defendant and his brother, and evidenced an atmosphere at odds with a dispassionate adjudication of guilt. The trial court's resolution of the conflict raised by the prosecution's counteraffidavits cannot be deemed binding in view of our duty to conduct an independent review here. A trial judge's proximity to the events behind the record does not necessarily render his judgment as to community prejudice more reliable than an appellate review of a "cold" record. In resolving a conflict raised by affidavits, the trial judge was—or should have been—limited to the same "cold" record which is now before us. Moreover, unlike the case of sensitivity to such nonverbal intangibles as the demeanor of a witness, a trial judge's sensitivity to the "temper of the community" may hamper rather than facilitate the proper performance of his role. In short, judges are human, and like most people are consciously or otherwise susceptible to needs such as that for the respect and friendship of neighbors and friends. When the cost of resolving a conflict of evidence in favor of a change of venue may well be a small community's anger at the opprobrium of an implied charge of partiality, or at a lost opportunity for retribution—and perhaps, in the case of elective judges—the loss of a prestigious vocation—proximity may not always favor justice. And, in a small community lacking a substantial number of attorneys and judges to which the performer of an unpopular legal duty might turn for understanding and support, proximity may even undermine justice where the issue is community partiality.

In reaching our own resolution of conflicting defense and prosecution showings in the instant case, we note that long before *Maine* and *Sheppard* this court recognized that affidavits to the effect that a defendant can obtain a fair trial may evidence rather than refute the existence of prejudicial hostility. In *People* v. *Suesser, supra,* 132 Cal. 631, this court declined to defer to a trial judge's decision to resolve a conflict of affidavits against a venue change. Justice Temple, writing for the court, argued: "Why courts should hesitate to grant [a] change of venue in a proper case, I cannot understand. It seems that many, perhaps most, of the merchants and business men of Salinas made affidavits of the nature I have stated above to prevent such change. Why? Was it feared the defendant would escape if he were allowed a fair trial? . . ." (*Id.,* at p. 635.) And, in *People* v. *McKay, supra,* 37 Cal.2d at pp. 796-797, we dealt with a situation in which instead

of executing affidavits to the effect that defendants could receive a fair trial, citizens contacted by defense counsel displayed obvious hostility toward the defense—as in the present case—but refused to execute affidavits regarding public sentiment apparently to avoid identification as persons responsible for a change of venue. Rather than deferring to the trial judge's resolution of the conflict between defense affidavits and those offered by the prosecution to show the public's " 'calm and wholesome feeling that justice be administered,' " we quoted at length from *Suesser,* and reasoned: "Although it may be true that the feeling of substantial citizens at the time of the crimes that 'the courts should not waste time on persons such as [defendants], but that instead [they] should be lynched and "strung up," ' had cooled by the time of the trial, the record demonstrates that it had been replaced by a cool, widely held conviction that defendants were guilty and should be tried and sentenced to death as expeditiously as possible. The community was determined that defendants be given no quarter. In no other way can be explained the antagonism toward defense counsel or the fact that 'all of said persons with whom [defense counsel] talked refused to make an affidavit concerning said public feeling and requested that [defense counsel] not disclose their names, upon the ground that they believed they would be criticized by their friends, customers and other persons of Shasta County.' "

The form affidavits presented by the district attorney were collected by deputies working under the authority of the brother-in-law of one of the murder victims. All of the affidavits were executed after publication of the district attorney's letter brought public attention to the possibility of a change of venue. In the face of the defense affidavits evidencing an overwhelming public feeling that the defendants were guilty, and attitudes of citizens such as " 'Why don't they just turn them loose, we'll take care of them,' " the prosecution's showing must be viewed with the perspective of *Suesser* and *McKay*: affidavits such as those the district attorney produced may well indicate only that public hostility was sufficiently intense that a number of citizens were willing to swear impartiality to preserve the community's opportunity to exact retribution from the suspects who were almost universally believed guilty. At the very least, *Suesser* and *McKay* indicate that pre-*Maine* standards do not require us to defer to a trial judge's resolution of conflicting affidavits, and *Sheppard* now forbids such deference.

Given the size of Lassen County, the nature of the crimes, and the position of at least two of the victims in the community, the trial judge should have granted a change of venue when he was presented with a showing of pervasive news coverage of prosecution evidence and county-wide

hostility toward the defense. The process of jury selection corroborated the defense affidavits, and should have resolved any possible doubts in favor of a venue change.

Although all of the jurors selected claimed the ability to sit impartially, such a claim is of course not conclusive. "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, 'You can't forget what you hear and see.' " (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 728 [6 L.Ed.2d 751, 759, 81 S.Ct. 1639].)

When the significance of associations between victims or witnesses and the jurors who actually determined defendant's fate is explored, the impossibility of an impartial adjudication of defendant's guilt and selection of penalty becomes obvious. A juror who remembers a murder victim as a living person faces a far more difficult task when asked dispassionately to judge the guilt and penalty of a stranger accused of killing that person than does a juror to whom both the accused and the victim are strangers. A juror who remembers a victim as flesh and blood is likely to find it difficult, if not impossible, consciously or otherwise to ignore natural feelings of identification with and compassion for a person he once could expect to encounter during the course of a normal day's activities. A juror who is likely repeatedly to recall a victim as the lady who waited on her at the local drugstore is unlikely to accord an accused an objective evaluation of the probative weight of evidence, of the credibility of witnesses who also interrelated with that victim, of the degrees of culpability which—however crudely—account for the degrees of murder, and of the circumstances upon which jurors must select a life sentence or a death penalty. Permitting a panel largely composed of acquaintances of victims to adjudicate an accused's guilt can only thwart the policies which demand that sympathy play no part in a juror's deliberations on the issue of guilt (cf. *People* v. *Polk,* 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641]; CALJIC No. 1) and that evidence concerning the character of a victim generally be excluded from the jury's consideration (cf., e.g., Evid. Code, §§ 1101, 1103). It would defy common human experience to deny that deliberations of such jurors differ in kind from those we would expect from strangers to the victim, or that the forces which account for this difference are totally alien to our concept of an impartial adjudication of guilt.

In *Turner* v. *Louisiana* (1965) 379 U.S. 466 [13 L.Ed.2d 424, 85 S.Ct. 546], the United States Supreme Court held that jury-trial rights are sub-

verted when jurors know key prosecution witnesses for three days in the capacity of sheriffs who have charge of a sequestered jury. A fortiori those rights were subverted when three jurors knew the county sheriff—one of them as a "lifetime friend"—who supervised and testified as to the entire investigation, when one juror had known for many years the deputy sheriff through whom over a quarter of the prosecution's exhibits were authenticated and introduced in evidence, when two jurors had already trusted a prosecution witness sufficiently to rely upon his medical services, and when unnamed prosecution witnesses were known to at least three jurors.

Even more so than in *Turner,* where the association between witnesses and jurors began during the trial, the fact that jurors have known witnesses as old friends infects the whole process of guilt adjudication. Surely a defense attorney's cross-examination—which may be critical to the jury's translation of a web of circumstantial evidence into guilt, degree, and penalty verdicts—will be often inhibited, and occasionally chilled entirely, by fears that a rigorous cross-examination may antagonize a juror who claims the ability to ignore the fact that the person on the stand is a friend. Carefully developed rules of evidence concerning proof and disproof of a witnesses' credibility becomes ridiculously irrelevant when eight members of the jury already know the reputation of one or more important prosecution witnesses from their own small community—and are capable, if necessary, of providing their fellow jurors with anecdotes whenever deliberations touch upon the reliability of that witness.

A further element of prejudice present whenever friends of prosecution witnesses in a small community sit on a criminal jury is that fear of those witnesses' future reactions to a verdict impliedly derogating their testimony may play a significant role, conscious or otherwise, upon a jury's deliberations. Here all witnesses produced in the guilt phase were prosecution witnesses, and impliedly friendly towards the district attorney's efforts to secure a first degree murder conviction and, perhaps, a death sentence. Certainly a juror who interacts with those witnesses—and, in the case of jurors Corder and Cealigo, also with surviving relatives of victims—on a routine basis in a small community may be affected by fears that anything less than first degree murder and death verdicts will be taken as an unfriendly or uncooperative reaction to those witnesses' attempts to aid the prosecution—or to relatives' presumed desire for a measure of retribution. When the attention of a small community is focused on a trial, testifying therein may become something of an honor, and is likely to be a subject of considerable anxiety, for many members of that community. Thus a juror's fears that a witness may take a mitigated verdict personally would not be unreasonable. And since the juror may consider himself honored and fortunate to be selected to culminate

a community's anger against a stranger accused of killing respected members of that community, returning anything less than a death verdict for first degree murder might be viewed as a betrayal of both his trust as a juror and his friendship with witnesses. When a juror might reasonably fear that the cost of a mitigated verdict might be a cooled or lost friendship, the loss of regular customers, and, possibly, the alienation of an entire community, there is a danger that such fears will play a part in his deliberations. Of course, it is totally improper for such considerations to enter a juror's guilt or penalty decisions. (E.g., *People* v. *Purvis,* 60 Cal.2d 323, 342 [33 Cal.Rptr. 104, 384 P.2d 424].) A system of law which claims it " 'has always endeavored to prevent even the probability of unfairness' " (*Sheppard* v. *Maxwell, supra,* 384 U.S. at p. 352 [16 L.Ed.2d at p. 614], and cases cited) cannot tolerate a conviction returned by a jury composed as this one was without belying that claim.

Although the reasons discussed above are more than adequate to demand a reversal for error in denying defendant's venue change motions, there is another factor which bears discussion. "[T]he jury was presented with the problem of determining the penalty to be imposed. . . . By law the determination of the penalty is left solely to the discretion of the jury . . . and accordingly, it was of vital importance that they should exercise that discretion free from bias, prejudice, or pressure from the community." (*People* v. *McKay, supra,* 37 Cal.2d at pp. 798-799.) As we noted in *Fain* v. *Superior Court,* 2 Cal.3d 46, at page 52 [84 Cal.Rptr. 135, 465 P.2d 23], "the issue of whether defendant lives or dies is manifestly no less critical than the issue of his guilt; and precisely because of the broader rules of admissibility and the absence of standards to guide the jury in choosing the appropriate punishment, a fair and impartial jury is no less essential at the penalty phase than at the guilt phase." The court's instructions concerning the jury's absolute discretion at the penalty phase in effect suggested, and in all probability ensured, that totally impermissible considerations would be given full rein in the jury's penalty deliberations. There is no reason whatsoever to conclude, for example, that jurors did not consider extrajudicial evidence of the credibility of the prosecution's witnesses in reviewing the certainty of their guilt verdict, or that jurors ignored the legally irrelevant attitudes of their friends and neighbors (*People* v. *Purvis, supra,* 60 Cal.2d at p. 342), in deciding to sentence defendant to death.

In sum, this trial had no hope of enforcing procedural guarantees which have been built up over centuries of legal experience. From the outset the entire community from which all participants except the defendant were drawn was familiarized with the details of the prosecution's case by exten-

sive publicity of the progress of the investigation of the murders—including the apprehension of the defendant and the discovery of items in his possession which were linked with the victims. The formalities which would follow—authenticating, offering, and receiving or rejecting items of evidence in the trial—cannot hide the fact that all 12 jurors had heard news of the case, and many must certainly have been aware of the prosecution's evidence. Rules of evidence limiting proof or disproof of witnesses' credibility were preempted by the fact that eight jurors knew witnesses—several as close friends. The constitutionally enshrined right of cross-examination is of little value to an attorney who must temper his skills with fear that he might anger the witnesses' close friends in the jury box—who will be invited ultimately to decide in their unfettered discretion if his client is fit to live. The solemn instruction to disregard sympathy must have met formidable barriers in its application by the four jurors who had known one or more of the victims as living fellow citizens. The court's repeated admonitions between trial sessions that the jurors were not to discuss the case among themselves or with others ring hollow when it is remembered that 10 of the 12 jurors had already discussed the facts of the case, as revealed by the press, before they were called as jurors. And, although "a juror's *general* views about capital punishment play an inevitable role" in the selection of penalty (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 519 [20 L.Ed.2d 776, 783, 88 S.Ct. 1770], italics added), the associations of jurors with victims, witnesses, survivors of the victims, and with other members of a community which had already heard the prosecution's evidence before the trial began, would not have been inevitable had the change of venue been granted. Such associations are certainly at odds with our concept of justice.

" 'The prisoner, whether guilty or not, is unquestionably entitled by the law of the land to have a fair and impartial trial. Unless this result be attained, one of the most important purposes for which Government is organized and Courts of Justice established will have definitely failed. ▪ Cases sometimes occur, and this would appear to be one of them, in which the very enormity of the offense itself arouses the honest indignation of the community to such a degree as to make it apparent that a dispassionate investigation of the case cannot be had. Under such circumstances the law requires that the place of trial be changed.' (*People* v. *Yoakum*, 53 Cal. 566, 571.)" (*People* v. *McKay, supra,* 37 Cal.2d at p. 800.)

In short, "It would be a judicial murder to affirm a judgment thus rendered, when the reason of the people of a whole county was so clouded with passion and prejudice as to prevent mercy, and deny justice." (*People* v. *Lee, supra,* 5 Cal. at p. 354.)

The judgment of convictions of first degree murder entered against defendant William Tidwell is reversed. The case is remanded to the Lassen

County Superior Court, and that court is directed to hold a hearing to determine where a fair and impartial trial can be had, and to transfer the cause accordingly.

Sullivan, Acting C. J., Tobriner, J., and Mosk, J., concurred.

**BURKE, J.**—I dissent. The instant case was tried before our decision in *Maine* v. *Superior Court,* 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], became final, and we expressly stated in *Maine* that the new standards it established were to be applied prospectively only (68 Cal.2d at p. 384, fn. 9). Nevertheless, the majority compare *Maine* with the instant case and treat it as controlling herein. Although I fully concur with the principles stated in *Maine,* the case before us now should be decided under pre-*Maine* standards.

*Maine* adopted two new principles regarding motions for venue change. First, such motions must be granted whenever a defendant demonstrates a "reasonable likelihood" that otherwise a fair trial cannot be had. Second, appellate courts must conduct an "independent review" of the circumstances to determine whether denial of a venue change deprived defendant of a fair trial. The latter standard was derived from dictum in *Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507]. Prior to *Maine,* this court had expressly held that *Sheppard's* independent review standard would not apply in reviewing denials of motions for venue change. Thus, in *People* v. *Modesto,* 66 Cal.2d 695, 705-706, footnote 2 [59 Cal.Rptr. 124, 427 P.2d 788], we acknowledged that *Sheppard* did not change California law, and observed that "While the *Sheppard* court discussed pretrial publicity at length, it explicitly declined to hold that such publicity in itself worked a denial of due process. . . . Thus the governing rule still requires the accused, under circumstances such as these, *to show prejudice in order to prevail;* no such showing has been attempted here."[1] (Italics added.)

The majority rely upon *People* v. *O'Brien,* 71 Cal.2d 394, 400 [78 Cal. Rptr. 202, 455 P.2d 138, 456 P.2d 969], to support its thesis that *Sheppard's* independent review test should be applied in a pre-*Maine* case. However, *O'Brien* did not disapprove *Modesto's* express holding to the contrary, and in fact acknowledged that *Sheppard's* pronouncements were mere

---

[1] See also Note, *The Supreme Court of California, 1967-1968,* 56 Cal.L.Rev. 1612, 1705, wherein the authors state that "*Maine's* most significant substantive *change* is its holding forbidding appellate courts merely to review the trial court's discretion, but compelling them to satisfy themselves independently that the standards for impartial jurors have been met." (Italics added.) And at footnote 13, the authors note that "The supreme court now finds binding the 'duty' imposed by *Sheppard* . . . to conduct an 'independent evaluation' of the motion for venue change, although in *People* v. *Modesto* . . . this 'duty' imposed by *Sheppard* was not binding."

dicta. Had *Modesto* been called to our attention in *O'Brien,* we might well have applied pre-*Maine* standards and required defendant to show actual prejudice and establish an abuse of discretion by the trial court. Our inadvertence in *O'Brien* was harmless, in any event, for we held that the denial of defendant's motion for venue change was proper even under *Sheppard's* standard.

In the instant case, the majority adopt the following test to be employed in pre-*Maine,* post-*Sheppard* cases: "If, on balance, we would have granted a change of venue were we in the judge's place, we must reverse his denial of a venue change." (*Ante,* p. 69.) Thus, this court is to decide the issue anew on the cold record, without regard to the trial judge's discretion in such cases and notwithstanding his proximity to the trial, the publicity alleged to have tainted it, and the temper of the community allegedly aroused thereby. Again, although the majority disclaim that they are applying *Maine's* standard of reasonable likelihood, they readily discard *Modesto's* requirement of actual prejudice on the theory that it is somehow incompatible with our asserted duty in pre-*Maine* cases to exercise independent judgment.

The majority's test, quoted above, is squarely contrary to *Modesto* (a pre-*Maine,* post-*Sheppard* case), and to many other decisions holding that our function is limited to determining whether the trial court *abused its discretion* in denying the motion (e.g. *People* v. *Duncan,* 53 Cal.2d 803, 812 [3 Cal.Rptr. 351, 350 P.2d 103]; *People* v. *Jacobson,* 63 Cal.2d 319, 325-326 [46 Cal.Rptr. 515, 405 P.2d 555]), and whether defendant has shown *actual prejudice* from pretrial publicity (e.g. *People* v. *Modesto, supra,* 66 Cal.2d 695, 705, fn. 2; *People* v. *Jacobson, supra,* 63 Cal.2d at pp. 325-326; *People* v. *Carter,* 56 Cal.2d 549, 572 [15 Cal.Rptr. 645, 364 P.2d 477]; *People* v. *Gomez,* 41 Cal.2d 150, 161-162 [258 P.2d 825]). As stated in *Jacobson, supra,* quoting with approval from a recent Vermont case, " 'newspaper articles, even though denunciatory in character, are not in themselves in the absence of some evidence of the actual existence of a *prejudice* against the accused, sufficient to require the judge, in the exercise of his *discretion,* to conclude that a fair and impartial trial cannot be had.' " (Italics added.) Again, in *Carter, supra,* where (as in the instant case) defendant had exhausted his peremptory challenges, this court held that "whether publications, accurate or inaccurate, warrant reversal depends on whether defendant has shown that they had a prejudicial effect."

In my view, defendant has not established that the pretrial publicity actually prejudiced the jury or otherwise precluded a fair and impartial trial. Although defendant submitted affidavits which indicated that most

persons interviewed shared an opinion of his guilt, the People submitted contrary evidence. The resolution of such conflicting evidence in a pre-*Maine* case was the responsibility of the trial judge, who observed the *voir dire* examination of the jurors and who stood in the best position to determine the extent to which pretrial publicity could affect the trial. (*People* v. *Carter, supra,* 56 Cal.2d 549, 571; *People* v. *Brite,* 9 Cal.2d 666, 689-690 [72 P.2d 122].) In any event, defendant's affidavits regarding the opinions of various members of the general public were insufficient to establish an actual prejudicial effect upon the jurors who heard his case. (*People* v. *Duncan, supra,* 53 Cal.2d 803, 812.)

It is perhaps inevitable that some murders achieve a notoriety which familiarizes an entire community with the nature of the crime. And yet this court stated in *Duncan, supra,* that "Even if it be assumed that many persons formed opinions unfavorable to defendant as a result of what was published, it does not follow that persons without such views could not be found to act as jurors or that those who had adverse opinions would be unable to set them aside and try the case fairly on the basis of the evidence to be produced in court. (See Pen. Code, § 1076.) Defendant's motion for a change of venue was addressed to the sound discretion of the trial judge, and we cannot say that he abused his discretion in denying it." (53 Cal.2d at p. 812.)

In *Duncan, supra,* four jurors stated that as a result of pretrial publicity, they had formed the opinion that defendant was guilty of murder, and that it would require further evidence to overcome their opinion. In sustaining the trial court's refusal to remove these jurors, we stated that "we have seen, however, the opinions were based on news reports and rumor, and, when questioned by the district attorney and the judge, the jurors stated that they would base their verdict solely on the evidence received in court and the instructions given them and that they would act impartially notwithstanding the opinions they had formed. Where jurors on *voir dire* have made conflicting statements similar to those involved here, it is a question of fact for the trial judge whether they can act impartially, and in such circumstances rulings denying challenges for bias have uniformly been upheld in this state as well as by the United States Supreme Court. [Citations.]" (53 Cal.2d at p. 816.)

In the instant case, 11 jurors stated that they had formed no opinion regarding defendant's guilt and that they would serve impartially and fairly. The twelfth juror, Mrs. Sanford, was not asked if she had formed an opinion regarding defendant's guilt. However, she stated that she had not discussed the case with anyone, had heard no radio reports regarding it, had read only "slight" accounts of the crime, and would be a fair

and impartial juror. Under the rule of the *Duncan* case, *supra,* we must uphold the trial court's discretion in permitting these jurors to serve.

Several jurors were acquainted with the victims or witnesses in this case. However, each such juror stated that his acquaintance would not influence his verdict or prevent him from serving fairly and impartially. Moreover, it has long been the rule in this state that "Mere acquaintance of the jurors with a litigant does not imply bias by them in his favor any more than it raises a presumption of prejudice against him." (*Perkins* v. *Sunset Tel. & Tel. Co.,* 155 Cal. 712, 715 [103 P. 190].) By a parity of reasoning, mere acquaintance of the jurors with the victims or witnesses cannot constitute implied bias. Thus, Penal Code section 1074 limits challenges for implied bias to "Consanguinity, or affinity within the fourth degree to the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted, or to the defendant." I conclude that defendant has failed to establish actual prejudice on the part of the jurors selected to hear his case.

Nor does the pretrial publicity on its face disclose that defendant could not have obtained a fair and impartial trial, for the news articles and releases were no different from the usual reporting of any homicide of this sort. (*People* v. *Carter, supra,* 56 Cal.2d 549, 572; *People* v. *Mendes,* 35 Cal.2d 537, 542 [219 P.2d 1].) In fact, the absence of hostility toward defendant in the pretrial publicity contrasts sharply with the publicity and public sentiment involved in such cases as *People* v. *McKay,* 37 Cal.2d 792 [236 P.2d 145], *People* v. *Suesser,* 132 Cal. 631 [64 P. 1095], and *People* v. *Yoakum,* 53 Cal. 566, which resulted in convictions being reversed and retrials ordered.[2]

Since defendant has shown neither actual prejudice on the part of

---

[2]In *McKay, supra,* "the community was thoroughly aroused [and] there was talk of lynching." (37 Cal.2d at p. 794.) In *Suesser, supra,* defendant was "denounced'" in the public press, which expressed the "greatest indignation and sorrow" regarding the crime. (132 Cal. at p. 634.) In *Yoakum, supra,* the crime caused "widespread excitement" and a "feeling of extreme hostility against defendant." (53 Cal. at p. 570.)

Even the *Maine* case, *supra,* was concerned primarily with "prejudicial newspaper publicity which either caused or reflected widespread *hostility* to a defendant in the community." (Italics added; 68 Cal.2d at p. 382.) *Maine* suggested that in determining whether a reasonable probability of prejudice exists in a particular case the trial court must consider "the extent of the *hostility* engendered toward a defendant." (Italics added; 68 Cal.2d at p. 388.)

In the instant case, the only publicity which could be characterized as "hostile" was a brief newspaper reference to "Jack or Jacqueline the Ripper" in describing the unknown assailant. After defendant and his brother were apprehended, there were no inflammatory or antagonistic news or radio reports whatsoever.

the jurors, nor an abuse of discretion by the trial judge, and since both elements are prerequisites to reversal under numerous pre-*Maine*[3] decisions of this court, I would affirm the judgment.

McComb, J., concurred.

Respondent's petition for a rehearing was denied September 24, 1970. McComb, J., and Burke, J., were of the opinion that the petition should be granted.

---

[3]Defendant contends that the application of pre-*Maine* standards to the instant case is unjust, since there are several factual similarities between this case and *Maine*. However, as stated by the United States Supreme Court in *Stovall* v. *Denno,* 388 U.S. 293, 301 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967], holding that the *Wade-Gilbert* lineup cases should not be given retroactive effect: "Inequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making." (Fn. omitted.)